SECURITIES AND EXCHANGE COMMISSION, Plaintiffs,

v.

FIRST JERSEY SECURITIES, INC., and Robert E. Brennan, Defendants.

No. 85 Civ. 8585 (RO).

United States District Court, S.D. New York.

June 19, 1995.

S.E.C., Washington, DC (John L. Hunter, Mark Kreitman, Christian J. Mixter, Thomas C. Newkirk, Mark S. Radke, of counsel), for plaintiff S.E.C.

Robinson, St. John & Wayne, W. Hunt Dumont, John B. Livelli, Claire C. Cecchi, Newark, NJ, for defendant First Jersey Securities, Inc.

Nixon, Hargrave, Devans & Doyle, Rochester, NY (David M. Schraver, Everardo A. Rodriguez, Maxine Yi Hwa Lee, of counsel), for defendant Robert E. Brennan.

## OPINION AND ORDER

OWEN, District Judge.

This civil action instituted by the Securities and Exchange Commission in 1985 was tried before me without a jury over some forty days in 1994. The amended complaint alleges that defendant First Jersey Securities, Inc., owned, operated and controlled by defendant Robert E. Brennan, realized illegal profits from excessive markups on sales from its inventory to its customers of the securities of three companies, Sovereign Chemical and Petroleum Products, Inc., Rampart, Inc. and Quasar Microsystems, Inc. in the years 1982–83. The amended complaint seeks a permanent injunction against certain future violations of the securities laws and disgorgement of all profits, from such sales together with prejudgment interest thereon, and the appointment of a special agent of the Court to examine all of First Jersey Securities' records from November 1982 to the present to determine the existence, if any, of similar violations and empowering such agent to recommend further proceedings and appropriate disgorgement if required.

Further, starting with an exploratory order in November 1987, I thereafter permitted similar issues to be raised and tried as to First Jersey's transactions in three other securities, Transnet Corporation in 1983, Sequential Information, Inc. in 1984, and QT & T, Inc. in 1985 (formerly Quasar Microsystems, one of the issuers named in the amended complaint),[1] and with the same request for disgorgement of profits should the facts warrant.

First Jersey, a broker-dealer registered with the Securities and Exchange Commission, commenced business in 1974[2] and by the early 1980s was operating as many as 36 retail branch offices nation-wide from its main offices in New York, New York and Red Bank, New Jersey. At its high point, First Jersey had approximately 1,200 salesmen or "registered representatives" and a retail customer base of more than 500,000 accounts. The foregoing retail selling capabilities enabled First Jersey to gross as much as 95 million dollars a year, 80 to 90 percent of which came from transactions in which it was selling as a principal and income from underwriting. The securities in which First Jersey dealt were generally priced at three dollars or less and were traded in the over-the-counter market.[3] Most of First Jersey's organization including research, compliance, operations, administrative and trading operated in New York City. Customers' statements, checks and securities were mailed from its main office in New York City. Branch offices did not perform operating functions. All mark-ups on First Jersey sales of securities were calculated in the trading department in First Jersey's New York office. First Jersey sought as salesmen in its branch offices individuals who had no prior experience in the securities field[4] for reasons that become obvious hereafter, given its methods of operation. One salesman, curious as to this, testified as to the result of his inquiry:

> Not one guy that I worked with had ever been with a brokerage firm ever.... [the branch manager] always made the comment that he would not hire a broker who had been with an existing brokerage firm, ... because they develop bad habits, work habits and that they just wouldn't hire them.

While First Jersey held itself out as being a full-service broker-dealer, its operations apart from underwriting and transactions into and out of inventory were very limited, the vast majority of its salesmen's efforts being to sell, under the direction of its branch managers, securities which First Jersey held in inventory as principal. This operation was typically on a monthly cycle and was quite rigidly controlled and supervised in whatever branch offices were selected to be involved in a given marketing situation. As is described *infra*, at times, basically certain branches would sell an underwriting to customers and then buy it back, and other branches would then sell the components from the repurchased instruments to *their* customers who were necessarily different from and ignorant of the customers involved in the underwriting and repurchase.

The duties of each of the 1200 salesmen were substantially the same, regardless of the location of the branch office. This was

---

1. The SEC at the outset contended that such proof, should it be established, would be evidence of defendants' continuing wrongful intent.

2. First Jersey filed a form instrument with the SEC on February 22, 1995, after the closing arguments before me in this case entitled "Uniform Request for Withdrawal from Broker–Dealer Registration," containing the statement that it ceased business "Effective January 10, 1995".

3. The over-the-counter market is a market essentially of telephone lines among many, many broker/dealers. Any registered broker/dealer can enter the over-the-counter market, and its "market place" consists of phone calls between brokers. This is in contrast to the New York Stock Exchange and the American Stock Exchange, which are centralized markets, where substantially all the orders both to buy and sell come into one marketplace.

Another difference is the information available to investors and potential investors in the respective marketplaces. At the time of the securities here at issue—the early 1980's—the over-the-counter market involved no real time reporting of what the volume or the price of over-the-counter securities transactions were.

4. Not atypical were such as a waiter in a restaurant, a bellman in a Playboy Club, and an employee of a 7–11 convenience store.

representatively described by a salesman formerly in the Houston, Texas office.

Q. Now, when you went to work for First Jersey, what if any, orientation were you provided?

A. Very little, if any. I just—it was a condition, first of all, it was just to pass my NASD Series 63 and just learn a script. That was it.

Q. What is the script that you're referring to?

A. Well, just prospecting. Once you get licensed, then you just get on the phone and you start prospecting. And the script [from the branch manager], it was just a couple of paragraphs. You just get on the phone and just would say, hello, Mr. Jones, my name is John Nooney. I'm with First Jersey Securities. How are you today?

And I would just go, Mr. Jones, First Jersey Securities, we're full service investment brokers. And as such, we handle all buy-sell orders on the listed exchanges or the over-the-counter market. We also get involved with tax reinvestments, tax shelters, IRA's. But where we specialize in and where we're best on Wall Street is our timely recommendations of stocks usually trading between two, ten dollars, in that price range.

I'm not calling you with anything specific at this time. And I was just simply wondering if something exciting did present itself on the market, would you appreciate a call.

It's been a while since I've done that, but I did that for two years straight.

Q. Where do these scripts come from?

A. Well, from Tom. The office managers. They just provided it.

Virtually all of the twelve former First Jersey salesman who testified for the SEC described the "script". Representative is such testimony as that of Frederick E. Thyer from the Atlanta office:

[We] did have a script that we used and this was given to us by [the manager].

Donald E. Strong from the Shawnee Mission, Missouri office stated:

[The manager], would give us a presentation as to how we would present this particular opportunity to our clients.

Claude Ware of the New Orleans office testified:

Q. Was there a typical monthly pattern?

A. Yes, there was.... For the first three weeks we went through the phone book and, you know, called people to find out who would be interested, which we would call them our prospects. And then usually the Monday, Tuesday of the fourth week before our month ended we would go and sit down with people that would sit down with us. And then the last three days, usually Wednesday, Thursday and Friday, we would start selling. That's when [the manager] would come out and give us the stock, and we would sell the last three days of the month.

Q. How about research, was there any research being done at the New Orleans office while you were there?

A. No.

Q. And did you do any research while you were there?

A. No.

Q. Why was that?

A. Basically there was no access. You couldn't find the stocks they were recommending, so where could you go? [The manager] gave us a presentation to go by, and that's basically all we ever used.

Q. Now, what kind of information was actually provided to you about the recommended stocks?

A. It was everyone was basically the same. It was about a page and a half of a legal pad, maybe a page presentation. And they all started the same way. I mean, he gave us, you know, spectacular turnaround situation, was a line that was almost in every presentation.

Or Jeffrey Ingles of the Houston office:

Q. So that what you called a script which came out of the sales recommendation meeting was nothing more than the notes that you took at the meeting, correct?

A. No, it was a verbatim presentation.

Q. Why do you say that?

A. Because it was repeated several times until we had it correct in our notes.

Q. And you were expected to take down every word?

A. That's correct.

Q. Who told you that?

A. [The manager].

Robert Holly of the Red Bank, New Jersey office stated:

We did have scripts which were handwritten in our own, and it was presented to us at a meeting with the, in meetings the information was presented to us in such a way that the branch manager, whether it was Egan, Dell or Hart, said, this is the way I would recommend, this is the way I would present this investment, and it was in our own handwriting, if that is a script. * * * I wrote down verbatim and adjusted it as to my liking.[5]

Or Gerard Doyle of the San Diego, California office:

[The manager] would come out of his office; he would tell us to clear the phones ... for the purpose of duplicating the script. I'm sure if you can memorize it, that would be fine, but in most cases everybody had to write the script down.

The process used by the salesmen goes by the description "cold-calling", and a registered representative in another First Jersey office apparently needed some coaching before going to work. He testified:

Q. Could you describe what [the manager] said to you and what, if any, instructions he gave you the first time you met him after passing the Series 63 Exam?

A. He told me to keep studying the information they had given me in the packet, primarily at that point the prospecting script, and he had me say the script to him once while I was there and he said it still needed a little work and to make sure that I had studied it more before our next meeting.

Little attention, if any, was given to instruction in terms of customary brokerage procedures or operations. One salesman's testimony was fairly representative:

Q. When you began working at First Jersey, were you provided with any manuals or handbooks or policy directives material of that sort?

A. No.

* * * * * *

Q. [W]hat, if any, directions ... were [you] given about how to go about your work as a registered rep.

A. Well, again, as far as the direction, it was just to prospect. That was the primary and the only direction is to get people that would listen to your story.

Q. And what did prospecting involve?

A. Well, it involved just getting names of people. Corporate directories were very big. Chamber of Commerce. Any lists.... And you would just call up and just get on the phone. And just like I mentioned before, I just had that one script in front of me and that's all I had to do.

A Houston salesman testified:

The day I passed my test, [the branch manager] took me to the back room ... where all the brokers worked, and said, this is your desk. And he grabbed a phone book and he opened it up on my desk and opened it to the electricians and pointed E, he said, those are great guys to call. And he handed me a script to read to get, to qualify the guys.

The timing of these activities was coordinated by branch office managers. The process of recontacting prospects was known as variously "touching base" or "requalifying". Branch office managers received instructions on when to requalify and when to recommend securities from First Jersey's main office in New York. Generally, under the direction of their office managers, branch office salesmen performed the task of prospecting, requalifying and recommending securities to their customers as a group. If a prospect agreed to consider a future recommendation, salesmen were instructed to record his or her name, address and other identifying information. Salesmen were to make only a general inquiry as to whether the

---

5. Interestingly, Mr. Holly was a witness whose deposition was scheduled by the defendants.

customer was willing to accept "risk". Until this action was filed in October 1985, First Jersey did not require salesmen to record a customer's income or investment objectives in any record.

During each monthly cycle which coincided with the pay period, after "prospecting", First Jersey branch office managers would inform their salesmen that First Jersey's research department would recommend an investment in the near future. The salesmen were then to recontact prospects to determine how much money they had available to invest. This was called "qualifying".

At that time, however, salesmen were not told the name of the company whose securities would be recommended and had no specific information regarding the upcoming recommendation. One salesman described the qualifying conversation as follows:

> [Y]ou call up and you say, hello, Mr. Jones, John Nooney at First Jersey Securities. How you doing? Did you get my card? Usually, you always sent out your card after you talk to them initially. Okay, good. Well, I just wanted to let you know that I've been in touch with research, and we're going to be looking at something super. And it's probably going to be developing in the next week or two. Are you in a position where, if it looks good for my clients, should I keep you in mind?

> That was it. And again, you're looking for the interest and ability. And the fellow would go, yeah, John, keep me in mind. Okay. Well, we'll probably be taking positions, maybe a couple thousand shares. Are you in a position to take advantage of it?

> Then you just find out whether or not then he has the ability. And if he does, great. Then you just move him from this little pile to this pile. If he doesn't, zip,

and you throw him away. And you just go on right to the next one.

The "qualifying" process had nothing to do with a particular customer's needs or situation, but rather was a method for determining how much total customer money was available for an upcoming First Jersey recommendation.[6] Following this, First Jersey from its New York City or Red Bank, New Jersey offices informed branch managers of the security to be recommended that month to its retail customers, whereupon, during the last week of a pay period,[7] branch managers held "recommendation meetings", for all their salesmen. The managers dictated a sales presentation or "script" on how to sell the recommended security. Salesmen were required to record these presentations and use them in contacting clients. One salesman's testimony was fairly representative:

> The selling presentation began with [the branch manager] coming out of his office. And everybody knew that was the day that we were going to ... sell the stock of the month, because that's—all of our commission that month came the last three days. Sometimes it started on a Monday, which was the whole last week, just depending on when [the branch manager] got the stock, I assume.

> And he would come out of the office and everybody would, had their legal pads, and he would give us a presentation of the stock.

> Q. What would he say?

> A. It was, Mr. Jones, ... I have a spectacular turnaround situation. He verbatim gave us a presentation to write down, word for word[.] And then at the end he would always say that now the best part, and the commission is ten cents a share, whatever it was at that point. And then he would say, okay, hit it. And then he would walk out of the room and we'd begin selling,

---

**6.**    One salesman testified:

[We were trying] to find out really as much as you can, what other stocks that he owned, and just try to get a feel for the guy as far as really how wealthy he really was.

**7.** The timing of this was psychologically well-conceived, creating not only the goad to an individual salesman's incentive to maximize earnings

before the cut-off, but also the peer pressure and team effort of all the salesmen collectively selling in each other's sight and hearing in the one big salesroom which each branch office had. I note that a further incentive to the salesmen here was the 10% commission on these transactions as contrasted to 3% on agency or non-First Jersey-recommended transactions.

we'd get on the phone, everybody at once, and start selling.

Q. How many stocks were there that were characteristically recommended at these kind of meetings?

A. It's just one.

As to research information, another salesman testified:

The only time we were provided with any information would be just on a recommendation. That would be the previous year's annual report, if they had one, or just if they were manufacturing a product, just their sales brochure. And we would get that at the meeting. Everybody would be together. And the direction was to try to pick out ten closes out of the material that we have ... that you could use to sell the stock to your clients and prospects.

Q. What is a close?

A. Hello, Joe, listen, we should take a thousand shares of this. The opportunities of tomorrow aren't going to stare you in the face today. You know, this thing looks super. We feel it's going to go. Get as much of this as you can. And you'd hammer them. You'd stay on the phone until—if they didn't buy, because you're not going to get another shot. And you would just stay on the phone. You were praised, really, for—I always remember this one guy, I mean, I just stayed on the phone for almost an hour, and he finally bought.

Salesmen were also advised of the commission they would make on the sale of a new recommendation at the recommendation meeting. Commissions for First Jersey recommendations ranged from three percent for underwritings to as high as ten percent for principal transactions. In addition, First Jersey office managers received a 50% "override commission" on all sales,[8] which at times were split with other senior salesmen. After a branch office recommendation meeting, all salesmen in the office were expected to sell the recommended security to their customers, and they all recommended the same security at the same time at the end of a pay

period. Negative factors, such as risks inherent in the recommended security, were generally not discussed. Deviation could incur wrath, as one salesman recalled it:

Q. Now, over ... the two years or so that you worked at First Jersey, do you have a sense of how your clients made out on recommended purchases that you recommended to them?

A. [M]y clients lost considerable bit of money.

Q. Did any of them make money over that period?

A. There were times in which stocks we had recommended were up in value, but those were unrealized gains; we never sold them and let the client keep the money. They were always rolled over, so to speak, into a new recommendation.[9] We were not allowed by ourselves to sell a stock out unilaterally without the other brokers doing it. There was always a recommendation to do it jointly. My clients did not make money in that process.

Q. Was there ever an occasion when you recommended to your client that they sell out and realize these unrealized profits?

A. It happened to me, yes. I had an initial public offering, a company called MEDIVIX. The stock was up, this is the best of my recollection, 50 to 60 percent. If you came in at a dollar a share, it was to $1.60. I had a client who had that. I recommended to him to sell it. He was losing on all his other stocks. I just wanted to show him here's a profit. I recommended it—one of the few times I took the initiative on my own—another stock that I liked that was a previous First Jersey recommendation. I placed him into it on my own.

Q. What was the reaction of the management to that activity?

A. Within a hour I was called into a meeting [with the manager,] * * * I was told that I had done the wrong thing. I

8. A number of First Jersey managers had incomes in the many hundreds of thousands of dollars a year.

9. See the Sovereign–Rampart transactions described *infra*.

was told that Jack Dell [10] was very displeased with what I had done, and who gave me the authority to go ahead and sell stocks when the home company had not made a recommendation. These were carefully researched companies. We were to buy when we were told to and sell when we were told to sell. I was reminded of that.

The salesmen were instructed to be aggressive with customers to get them to "roll over" their money as described above. One testified:

A. If a client was involved in an underwriting and did not follow the recommendation to take profits and move those profits into the second recommendation, then we were told not to recontact them with underwritings. [This was done] ... [i]n a meeting format with all the brokers and [the managers] in front of us, because it did happen on occasion where somebody would just take the money and try to run.

Q. What happened on those occasions, if you recall?

A. We were told to get back on the phone, recontact the client, and try to get them to continue to invest all the monies with us.

A typical format to induce such a roll over was as follows:

THE WITNESS: A meeting was held to take profits in TransNet and presentation given to take those proceeds and move into Lincoln Log warrants.

THE COURT: How do you take the profits? Tell me what happens.

THE WITNESS: You tell the client that [you] bought the units at $1 a unit, they are now trading in the aftermarket at a dollar and a quarter, we think we have a nice profit in there, and we have another situation we think we can also make some profits in, let's lock in [your] profits on TransNet and move it into the next company.

First Jersey salesmen were given directions not to discuss branch office recommendations with salesmen from other First Jersey branch offices, because some branches were buying back common stock or units of a company at much lower cost than other branches which were at the same approximate time selling the same common or components from the units to other customers at inflated markups. Salesmen were also discouraged from conducting independent research on First Jersey recommended securities, and requests to the New York City office for information concerning such securities had to be channeled through the branch manager, for control.[11]

■ The proof at trial [12] established that as to the six instances between late 1982 and early 1985, as to which the SEC offered proof, First Jersey repurchased from certain of its retail customers securities that it had previously underwritten and immediately resold those securities (or, in most instances, components thereof) at illegal markups, to *other* retail customers for a total profit to First Jersey on those sales of more than $27 million, without disclosure to either group of customers.[13]

---

10. Dell was First Jersey's Director of Sales.

11. I credit the foregoing testimony of those former First Jersey salesmen who testified live or by deposition before me notwithstanding Brennan's threat to them, *see infra,* and I reject any testimony of First Jersey's former branch managers to the contrary. Most of these managers went first to Sherwood Capital to which First Jersey sold all but three of its branches, those three going to F.N. Wolf, and even today after Sherwood shortly passed from the scene went on to such firms as Hibbard Brown or F.N. Wolf with which Brennan has substantial continuing connections, *see infra.* There, continuing relationships have kept them directly or indirectly in Brennan's thrall. And, of course, the mountainous statistical evidence from First Jersey's transactional and commission records supports the credibility of the former salesmen's testimony beyond peradventure.

12. At the core of this proof was a massive statistical work-up by SEC staff accountant Robert Lowry of all of First Jersey's transactions in the securities in issue taken from First Jersey's records. This was then assessed against contemporaneous law by plaintiff's expert, Professor Robert Haft.

13. As to Rampart, the same basic format was used, except that instead of repurchasing *units* from customers to whom it had just sold such units, First Jersey repurchased over 2,000,000 shares of common stock at $1.50 from customers it could locate from its records to whom it had previously sold such stock, and then resold approximately the same amount to other customers at $2.50.

In most of the instances, the programmed format began with First Jersey as an underwriter selling "units" to the public in a small unknown company. First Jersey in each case was the sole underwriter and set it up this way with each issuing company.[14] Each unit generally consisted of a number of shares of stock and one or more warrants. The prospectuses under which these units were sold all provided that the units were to remain intact (that is, the components could not be "unbundled" and sold separately) for some period of time such as six months, "or such earlier date as may be elected by the underwriter"—that is, First Jersey.

Thus, taking Sovereign as a representative example, First Jersey had been authorized to sell commencing November 9, 1982, 1,100,000 Sovereign units in an underwriting. Each unit consisted of 3 shares of common stock and 1 warrant. The units were not to be split for six months (except at First Jersey's option). The underwriting price was $3 a unit and on the first day of the underwriting, First Jersey sold almost 1,700,000 units, obviously over-selling by some 600,000 units. Then, within days, First Jersey bought back over 1,300,000 units at $3.50 [15], and immediately split the units into their components, (not having told the customers from whom the units were bought that was their intention). It then priced the components of the units just repurchased for $3.50 at approximately $8.00 ($2.25 to $2.50 for each of the 3 shares of stock and $1 for the warrant) and immediately sold over 3,000,000 shares of common and over 1,200,000 warrants to other customers at other branches, without telling these customers of its immediately prior unit buy-back.

In rounded-off outline, with 1,100,000 units authorized, First Jersey's transactions in Sovereign Chemical commencing November 9, 1982, the first day of the public offering, were as follows:

| 11/9 | FJ Sells | 1,689,000 | Units at 3 |
| 11/18 | FJ Repurchases | 1,162,000 | Units 3½ |
| 11/19 | FJ Repurchases | 159,000 | Units 3½ |
| 11/22 | FJ Repurchases | 50,000 | Units 3½ |

The units, each consisting of 3 shares of common stock and 1 warrant, split on 11/22.

| 11/22 | FJ Sells | 1,291,000 | Common 2¼ |
| 11/23–26 | FJ Sells | 1,809,000 | Common 2½ |
| 11/24 | FJ Sells | 1,223,000 | Warrants 1 |

The Branches Listed Below Accounted for 83% of the Rampart Repurchases from Customers
Danvers, Mass.
Houston, Texas
Wayne, Pa.
Rochester, N.Y.

The Branches Listed Below Accounted for 96% of the Rampart Sales to Other Customers
Falls Church, Va.
Atlanta, Ga.
New Orleans, La.
Red Bank, N.J.
N. Palm Beach, Fla.

14. The issuing companies obviously accepted this structuring of the underwriting by First Jersey, since the issuers' essential interest was to get the funding the underwriting would provide.

15. First Jersey attempted to attribute this over-selling by 600,000 units to problems of record-keeping and salesmen's exuberance, and the repurchases to covering what it was "short". This claim founders on the fact that First Jersey repurchased some 700,000 shares more than it needed to cover any "short"—paying, I note, a slight premium for all shares—demonstrating that this was part of its plan to build up an inventory, split the units and sell the components at the mark-ups as discussed *infra*. The claim is further undercut by what happened in Sequential. There, First Jersey did *not* oversell the units in the underwriting, selling 2,941,000 units of the 3 million authorized. The next day it bought almost all of it back at a ¼ point markup so as to have inventory of common stock bought at 4½ cents from which to sell at 12½ cents starting five days later. Here I note that, it sold more common stock than were in the units it bought back,

This pattern was followed thereafter in five other issues. In Quasar, the repurchases of the units by First Jersey started the same day as the underwriting and First Jersey's sales of the broken-out common started the next day.[16] In Sequential, as earlier observed in a different context, where each unit contained 50 shares of common at 4 cents,[17] not to be split for 3 years except at First Jersey's option, 2,900,000 units were sold on the underwriting on June 13, 1984; 2,300,000 units were bought back the next day, and within the next two weeks, First Jersey sold 153,000,000 shares of common from the units for 12½ cents each, having bought them back in packaged form at 4½ cents each. Here First Jersey did not get around to sending the formal letter to the company to effect the breakout until June 29, *after* the 153 million shares of common had been sold.

It is accordingly overwhelmingly evident that First Jersey in each of these five underwritings intended, prior to the time of the underwriting, to immediately repurchase the units just sold, and make its own decision as to how far up it would mark the components for resale with no concern for any market. It could do this since it *was* the market. Thereafter, using its 1200 programmed salespersons and 500,000 customer accounts spread among more than 30 branch offices, it sold to those selected buyers who were as much in the dark as to prevailing market price as were its other customers who had just sold back to First Jersey in these little-known companies.

Defendants First Jersey's and Brennan's conduct, was entirely purposeful. It was planned this way. This is clear not only from the patterned and repeated format of the trading, but also from the simple programmed structure of First Jersey's marketing system.[18] Defendants orchestrated every facet of First Jersey's branch office network to ensure that the firm's underwritings and other low-priced stock recommendations were sold *when* they wanted—*where* they wanted—at prices determined not by market forces but by First Jersey itself. Its salesmen themselves, with minimal information and the incentive of earning as much as ten percent (plus a five percent managers' override) on a customer's investment dollar, were accordingly able to sell to the firm's customers securities at illegal mark-ups up to as much as 150 percent.

I conclude without question that defendants' conduct with respect to the sales and resales of securities to First Jersey's customers, as described above, violated Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a) (1993), and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) (1993) and Rule 10b–5 thereunder, 17 C.F.R. 240.10b–5, (detailed *infra*) and constituted a massive and continuing fraud on its customers, founded on the use of fraudulent devices in the offer, purchase, and sale of securities. The whole point of the scheme was to leave both the customers selling securities back to it (usually "units") and the customers purchasing securities from it (usually "unit" components), completely ignorant of the way in which First Jersey had in all other respects dealt in those securities, and as to the sales of the components, First Jersey's salesmen knew almost nothing about the companies, and knew they were selling to buyers who knew even less. Particularly in a factual context where First Jersey dominated and controlled the markets for the respective securities, this is unquestionably securities fraud under decisions that go back over fifty years.

■ Since 1939 it has been clear that a registered broker-dealer such as First Jersey impliedly represents, by virtue of doing busi-

---

indeed, more than were in *all* the units in the underwriting and there was no proof before me that it even bothered to cover its ultimate short sale of the common stock.

**16.** Here the units were not to be separately transferrable for 90 days, "... or such date as [First Jersey] shall determine." On this record, there is no evidence that as to Quasar, First Jersey ever sent the "determin[ing]" letter to the issuer.

**17.** $2.00 a unit for 50 shares.

**18.** See *supra* where salesman Nooney, in his deposition in 1988, could recite from memory his First Jersey-provided-script he had used for "two years straight" some four to six years before.

ness or "hanging out its shingle", that customers will be dealt with fairly, and that a broker who violates this representation also violates the general antifraud provisions of the securities laws. In *Duker & Duker,* 6 S.E.C. 386 (1939), the Commission, reviewing the actions of a broker-dealer that had induced its customers to exchange securities that they owned for bonds which the broker-dealer sold them at above-market prices, stated that

> [i]nherent in the relationship between a dealer and his customer is the vital representation that the customer will be dealt with fairly, and in accordance with the standards of the profession.... [F]raud is avoided only by charging a price which bears a reasonable relation to the prevailing price or disclosing such information as will permit the customer to make an informed judgment upon whether or not he will complete the transaction.

*Id.* at 388–389.

The Commission's administrative orders being subject to review by the federal courts of appeals, *see, e.g.,* 15 U.S.C. § 78y(a) (1993), the principles of *Duker & Duker* were shortly specifically approved by the courts. In *Charles Hughes & Co. v. SEC,* 139 F.2d 434 (2d Cir.1943), *cert. denied,* 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944), the Second Circuit affirmed a Commission order revoking a broker-dealer's registration for, among other things, violations of Section 17(a) through "continued sales of securities to customers at prices very substantially over those prevailing in the over-the-counter market, without disclosure of the mark-up to the customers." *Id.* at 435.

> Even considering petitioner as a principal in a simple vendor-purchaser transaction ... it was still under a special duty, in view of its expert knowledge and proffered advice, not to take advantage of its customers' ignorance of market condition. The key to the success of all of petitioner's dealings was the confidence in itself which it managed to instill in the customers. Once that confidence was established, the failure to reveal the mark-up pocketed by the firm was both an omission to state a material fact and a fraudulent device. When nothing was said about market price, the natural implication in the untu-

tored minds of the purchasers was that the price asked was close to the market. The law of fraud knows no difference between express representation on the one hand and implied misrepresentation or concealment on the other.

*Id.* at 437 (citations omitted).

Subsequently, in *Norris & Hirshberg, Inc.,* 21 S.E.C. 865 (1946), *aff'd,* 177 F.2d 228 (D.C.Cir.1949), the Commission reviewed the practices of a broker-dealer who traded with customers in securities that had no market, stating:

> [w]hile many of the classic manipulative techniques may not have been used, the vice inherent in respondent's purchases and sales without full disclosure of the fact that the market was dominated by respondent is the same as that inherent in a classic manipulation: The substitution of a private system of pricing for the collective judgment of buyers and sellers in an open market.

> \*     \*     \*     \*     \*     \*

> Each of respondent's sales carried with it the clear—though implied—representation that the price was reasonably related to that prevailing in an open market [citing *Duker & Duker and Charles Hughes & Co.*]. Without disclosure fully revealing that the "market" was an internal system created, controlled, and dominated by the respondent that representation was materially false and misleading.

21 S.E.C. at 881, 882. *See also S.T. Jackson & Co., Inc.,* 36 S.E.C. 631, 654 (1950); *Halsey, Stuart & Co., Inc.,* 30 S.E.C. 106, 112 (1949). And if there are two "markets" for a security, sellers of securities "ha[ve] the right to know that the defendants [are] in a position to gain financially from their sales and that their shares were selling for a higher price in [the second] market." *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 *reh'g denied,* 407 U.S. 916, 92 S.Ct. 2430, 32 L.Ed.2d 692 (1972).

*SEC v. Rega,* [1975–76 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,222, 1975 WL 4508 (S.D.N.Y. July 3, 1975), *aff'd in part, rev'd in part on other grounds sub. nom.*

*SEC v. Coven,* 581 F.2d 1020 (2d Cir.1978), *cert. denied,* 440 U.S. 950, 99 S.Ct. 1432, 59 L.Ed.2d 640 (1979), applied the foregoing principles in the context of a public offering of securities and aftermarket trading of those securities. There, Carlton–Cambridge & Co., a broker-dealer, through its president, Joseph Rega, underwrote and then traded in the securities of a company called Dennison Personnel, Inc. The parallels to First Jersey here are striking.

> There is no question that during the period from June to October 1972 Rega and Carlton controlled the market in Dennison. This domination was greatly facilitated by the fact that a substantial percentage of the Dennison issue—allegedly 2,727,000 shares of 3,073,500 shares issued—were in the hands of Carlton's customers. These customers sold to and purchased Dennison from Carlton at prices set by Rega. Given Carlton's total dominance of the market the scheme worked quite effectively. Carlton initially sold "short" to its customers and purchased the shares from its customers at lower prices to cover its short position. Also Carlton just cross-traded customers sell and buy orders, resulting, of course, in a nice profit for the firm. As a result of all this Carlton was a market unto itself making it appear that in fact there was an independent and free market in Dennison rather than the contrived artificial market which in fact it was.

*Id.* at ¶ 98,146. The Court, citing *Charles Hughes & Co.,* had no difficulty in concluding that defendants violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act. *Id.*

Accordingly, there is no question that First Jersey's sales practices violated Sections 17(a), 10(b), and Rule 10b–5.

Next, the evidence overwhelmingly established that the defendants wilfully and deliberately violated established law forbidding excessive markups as well.

■ The starting point in determining the legality or illegality of a broker's markup on a sale of stock is the establishment, from the best available evidence, of the prevailing market price, *see, e.g., Alstead, Dempsey & Company, Inc.,* 30 S.E.C. Docket 208 (1984). This is a factual, not a legal search.

■ Having made such a determination, under the law, a broker-dealer who charges his customer an undisclosed markup of more than 10% above the prevailing market price for an equity security commits securities fraud per se. *See, e.g., Peter J. Kisch,* 25 S.E.C. Docket 1242 (1982); *Powell v. Associates,* 24 S.E.C. Docket 1577 (1982); *James E. Ryan,* 24 S.E.C. Docket 1716 (1982), *aff'd, James E. Ryan v. SEC,* No. 82–7312, 709 F.2d 1518 (9th Cir. Feb. 10, 1983); *Sherman Gleason,* 15 S.E.C. 639, 651 (1944).

While the markup on a broker-dealer's sale to its customer is calculated by subtracting the "prevailing market price" for the security from the price charged to the customer, under case law, the "prevailing market price", the starting point for a markup assessment, is determined differently depending on a number of factors, including the nature of the market for the security and whether or not the broker-dealer is or is not a "market maker" in that security. A "market maker" in a security is a broker-dealer who holds itself out to the broker-dealer community as standing ready to purchase and sell that security at particular quoted bid and asked prices and who does, as proved by actual transactions, make a continuous, two-sided market in that security.[19]

Accordingly, the guidelines for determining prevailing market price as summarized in *Zero Coupon Securities* Release No. 34–24368 (Apr. 29, 1987), are, as a general matter, as follows:

> The best evidence of the prevailing market price for a broker-dealer who is not making a market in the security is that

---

**19.** 15 U.S.C. § 78c(a)38 (1993) defines "market maker" as follows:

> The term "market maker" means ... any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise)

as being willing to buy and sell such security for his own account on a regular or continuous basis.

However, mere listing in the "pink sheets" as they are called, does not, as First Jersey claims, a "market maker make."

dealer's contemporaneous cost of acquiring a security. For a broker-dealer who acts as an "integrated market maker" in a security—i.e., one who both makes a market in a security and in addition sells it to retail customers—the best evidence of prevailing market price generally is contemporaneous sales by the firm (or by other market makers) to other securities dealers.

For securities that are actively traded between dealers, those dealers' "ask" quotations may be used to gauge prevailing market price *if* the quotations have been validated by actual transactions; for securities not actively traded between dealers, actual transactions must be looked to for the prevailing market price, because quotations in an inactive market are frequently nothing more than invitations to negotiate a price.

Where, however, a security is not only inactively traded between dealers, but a competitive market does not exist because that market is "dominated" by a single dealer, the use of market maker sales or quotations is likely to be impractical or misleading. In such a "dominated" market, the best evidence of prevailing market price is the dealer's contemporaneous cost, which is either the price that the dealer paid to other dealers, or the price that the dealer paid to its retail customers to acquire the security (after an adjustment that allows the dealer a markdown [20] on purchases from customers).

■ The purpose of these common sense requirements is to prevent overreaching against retail customers. When they are violated, a broker-dealer commits securities fraud. Here, First Jersey was not a market maker since it did not, in the broker-dealer community, make a continuous two-sided market in any security that was in issue on this trial. Further, it dominated and controlled the trading in each of the nine securities at issue. Accordingly, First Jersey was required to price its retail sales to its customers based on its contemporaneous cost to acquire the securities. And, as stated in *Meyer Blinder*, 52 S.E.C. 1145, n. 17 (1992):

In determining the prevailing market price for a stock, we and the courts have held that there is a presumption that a dealer's own contemporaneous cost in acquiring the stock it sells to its customers is a fair representation of the stock's prevailing market price. *Barnett v. U.S.*, 319 F.2d 340, 344 (8th Cir.1963).

*Contentions of Defendants' Experts*

While from the testimony of First Jersey's salesmen themselves, thoroughly supported by First Jersey's trading records and commission runs, as well as by much other collateral evidence, the obvious conclusions above are mandated, some comment is appropriate to dispel any clouds that expert witnesses for the defense endeavored to create.

Defense witness attorney Peter Shaeffer, presented on markup issues, testified that he was only able to deal with market calculations on four of the nine securities at issue, and even as to those had to acknowledge that First Jersey had charged $243,619. in excessive markups. His effort to blunt the SEC's position required him to espouse two contentions. One was that in 1982, and until 1992, the use of retail purchases by a broker-dealer as the bench mark for calculating markups was not known to the law and the other was that this bench mark, which he asserted emerged in 1992, even then could only be used in circumstances where there were *no* interdealer market purchases to look to for the prevailing market price. Neither of these conclusions, however, has support. First, there *were* markup cases decided by the SEC as far back as 1960 and 1961 using retail purchase prices as bench marks for calculating markups. *See Amsbary, Allen & Morton, Inc.*, 42 S.E.C. 919, 920 (1966); *Manthos, Moss & Co., Inc.*, 40 S.E.C. 542, 544 (1961); *W.T. Anderson & Co.*, 39 S.E.C. 630, 634 (1960).

---

**20.** When purchasing securities for its own account from a retail customer, a broker-dealer generally does not commit fraud it if pays the customer a price that is ten percent *less* than the prevailing market price for that security. This ten percent reduction is called a "markdown", as distinct from a "markup," which refers to an additional increment over the prevailing market price that a broker-dealer charges to a customer who is *buying* a security from the broker-dealer.

■ Second, Shaeffer was in error contending that under the law a broker-dealer may only use its own retail purchases as a bench mark where there are *no* interdealer market purchases by any dealer with any other dealer, or, stated conversely, that if there are *any* transactions between *any* dealers, those alone must be looked to regardless of whatever and how many transactions the broker-dealer in question is contemporaneously having with its own customers. Not only is this not the law, but it does not accord with the factual realities in the market place. The use of contemporaneous interdealer purchases which the law requires be looked to first for prevailing market price are purchases *by the broker-dealer in question* from other dealers, *see Meyer Blinder, supra.* If the dealer in question has no contemporaneous purchases *from anyone, other dealers or its customers,* then contemporaneous interdealer transactions by others may be examined *as some evidence* of the prevailing market price for lack of any other bench mark. *Bison Securities,* Release No. 34–32034 (Mar. 23, 1993).

Thus, I cannot accept Shaeffer's conclusion that where First Jersey had enormous contemporaneous purchases from its own customers but made no significant purchases in the interdealer market, it can disregard the prices at which it purchased from its thousands of customers and look retrospectively to a transaction here or there of other dealers to now assert before the Court a "prevailing market price" against which *its* markups are to be viewed. And this, as noted, is also factually flawed in that a broker-dealer such as First Jersey as to a pink sheet/over-the-counter stock would not know the prices of interdealer transactions "away" from it for long periods of time after the fact, and therefore it was impossible for its trading department to have used such "away" transactions in making a contemporaneous determinations as to its own retail sales prices.[21] And Shaeffer's legal assertion is obviously in conflict with the very straightforward statement in *Meyer Blinder* itself, 52 S.E.C. at n. 17 (quoted *supra.*)

Further, Shaeffer, to support his analysis, had to assert that as to certain of the securities in issue, First Jersey was a market-maker and therefore could pick and choose from not only its own interdealer sales transactions, but also from "away" transactions by other dealers in a hindsight search for the most advantageous transaction price to proffer to the court in defense of the markups at issue here. However, it is clear that under the tests catalogued in *zero coupon securities, supra* that in no instance was First Jersey a market-maker in any of the securities in issue. Appropriate here is the Commission's observation in *Sacks Investment Company* that:

> to be treated as a market maker, a dealer must, among other things, advertise its willingness to buy and sell securities for its own account and stand ready to buy and sell to other dealers at its quoted prices. Merely buying shares from other dealers for resale to customers does not qualify a broker-dealer as a market maker.

\* \* \* \* \* \*

We have previously noted, however, that listing in the pink sheets is not dispositive of a dealer's status as a market maker. The dealer must be engaged in wholesale trading activity in the security in question.

54 S.E.C. Docket 784, 787–88 n. 11 (footnote omitted). And in *Century Capital Corp.,* 54 S.E.C. Docket 685, 688 n. 9, the Commission observed that "We have consistently rejected the notion that a firm is acting as a market maker when it is merely engaged in acquiring shares from other dealers for resale to its retail customers"—precisely what First Jersey was doing. Sporadic and relatively insubstantial dealer sales do not suffice to afford First Jersey market maker status.

One further error in Shaeffer's analysis needs to be observed. To reach his conclusions, even as to those securities for which he

---

21. Again, as I noted *supra,* the Court never heard from head trader Nadino, or anyone else at First Jersey, as to how prices were in fact established in the trading department as to any sales at issue in this case. And, I further note that defense expert Shaeffer never asked anybody at First Jersey how it arrived at its markups in this case, and accordingly, professed no knowledge on that subject.

did perform a market analysis, it was necessary for him to assert that First Jersey did not dominate and control trading in order to avoid the impact of the "contemporaneous cost" standard. This he sought to accomplish by entirely focusing on First Jersey's percentage of the interdealer trading, completely disregarding its massive retail trading. However, this flies in the face of common sense and the rule of *Alstead Dempsey* which looks at the entire market, including transactions with both customers and other dealers. And under that rule, First Jersey's percentages of the market in all cases were higher than the 86% *Alstead Dempsey* found to constitute control. Accordingly, Shaeffer's conclusions regarding calculations of markups are rejected on both factual and legal grounds.

Next, as to five of the nine securities in issue, First Jersey and Brennan took the position that one could not apply traditional markup analysis, since there were not sufficient interdealer transactions to support it. As to those five, their expert, Professor Gregg Jarrell, had two contentions. First, that the cost of repurchasing the units could not be used to compute prevailing market prices for components because a unit is fundamentally different from its components, and second, that First Jersey's sales prices to customers were "fair" when viewed against what Jarrell asserted was their "value". These assertions, for various reasons, do not survive analysis. First, First Jersey and Brennan never gave a thought to this issue at the time the units were repurchased and the components sold, always regarding the units sold in the underwritings and immediately bought back as already being components available for sale even at the time of the underwriting, and accordingly, the argument as to the alleged illiquidity of units as compared to the liquidity of the stock, even if it has validity in other circumstances, has no validity here.[22] Second, First Jersey at the time never gave a thought to the liquidity question, making its own determination as to the price at which it would sell the components of the units it was reacquiring.[23]

Next, at to Jarrell's contention that as to each security for which Shaeffer was unable to ascertain and urge a prevailing market price, the sales price was "fair", I observe that first, there was no testimony in this case that anybody at First Jersey ever established a resale price based on some asserted analysis of fairness, and second, even if that had

---

**22.** In this regard, defense expert Shaeffer's testimony on cross-examination on a collateral subject was damagingly illuminating:

> Q. You agree, do you not, Mr. Shaeffer, that a rational unit purchaser in any of the unit offerings here at issue would not sell his unit back to First Jersey at the price First Jersey offered if the unit purchaser knew that First Jersey was going to immediately split the unit into its components and sell them off at twice that price, as it did, for example, in Quasar?
> A. I agree with that.

**23.** The defense also attacked the "unit cost allocation" which the SEC has applied here in assigning contemporaneous cost to the units' components. This formula, simply described, works as follows:

> If a unit consists of two shares of common and one warrant, and First Jersey buys it back from a customer for $1 and then sells the common at $.75 a share and the warrant at $.50, the First Jersey sales price for a unit equivalent is:

> | | | |
> |---|---|---|
> | 2 Common @ $.75 | = | $1.50 |
> | 1 Warrant @ .50 | = | .50 |
> | Total | | $2.00 |

Thus, under the allocation formula, 1 share of common is 37.5% of the unit equivalent and 1 warrant is 25%. Applying that percentage to the acquisition cost of the unit, each share of common has a cost basis of $.375 and each warrant $.25. The unit allocation cost formula not only comports with common sense but is also consistent with language that First Jersey put in such documents as the Quasar prospectus which states at p. 27 under "Tax Considerations Regarding Units", that "The cost of each unit will be allocated among each of its elements (three shares of common stock and one warrant) in accordance with their relative fair market values to determine the adjusted basis of each such element for Federal income tax purposes." And Exchange Act Rule 10b–7(j)(7), regarding stabilization activities by underwriters, provides in pertinent part that

> When two or more securities are being offered as a unit, the component securities shall not be stabilized at prices the sum of which exceeds the offering price of the unit.

Nor do I find it a bar to the application of such unit cost allocation, that it has not received prior judicial imprimatur. It has a sound basis not only in economics but also in the factual setting this record has put before me. I accept it and apply it.

occurred, it is irrelevant. The test is not whether a stock is sold at a price that some analyst might believe is fair, but whether or not, as was held in *Charles Hughes v. S.E.C.*, it was sold at a price reasonably related to that prevailing in the market, which is what an untutored customer was entitled to expect, and not at a price that First Jersey's trading room arbitrarily established knowing it controlled and dominated the market.

Accordingly, Jarrell's efforts to give validity to First Jersey's conduct in this situation fails.

### Brennan's Personal Responsibility

■ The proof at trial showed plainly that Brennan was a "hands-on" manager who was intimately involved in the operations of First Jersey, including all significant decisions regarding the firm's underwriting, retail sales and trading activities. Brennan signed every one of the underwriting agreements at issue in this case and admitted that he "typically" participated in the key decision to split "units" into their component securities.

In his trial testimony Brennan—never denied knowing that First Jersey had repeatedly underwritten "units", and bought the units back from its customers, and had broken up the units, and resold the components to other customers without disclosing the price at which it had repurchased the units. To the contrary, he defended those transactions, taking the position that First Jersey's massive and repeated oversales and repurchases of units were, essentially, accidental, and that the firm's unit repurchases and the prices at which they were acquired, were not material to the customers who bought the components.[24]

Brennan was the 100% owner of First Jersey throughout the relevant period and received periodic reports on First Jersey's positions in the various securities that it traded, which one would expect given the

fact that every major trading decision by First Jersey went directly to Brennan's bottom line. As Roger Barnett, now its President, testified with respect to First Jersey's commission practices, "if [Brennan] insisted on it and he didn't listen to anyone else, he could have made any decision he wanted to."

Brennan, while testifying as a hostile witness in the plaintiff's case, did not testify in defendants' case and never contended that the sales practice and markup violations proved at trial were due to the unauthorized actions of other executives at First Jersey. Such a contention would in any event have been completely undercut by defendants' failure to call as witnesses anyone from First Jersey's Trading Department including Anthony Nadino, its head trader at all relevant times here with whom Brennan is still connected (*infra*), nor did defendants call John Dell, who was the head of First Jersey's Sales Department. Taking into account all the facts and circumstances bearing upon those witnesses' relations to the parties, the Court is entitled to infer that the testimony of Nadino and Dell would have been unfavorable to Brennan and First Jersey. *See, e.g., United States v. Torres*, 845 F.2d 1165, 1169–70 (2d Cir.1988).

Thus, the evidence compels the conclusion than that Brennan is primarily liable with First Jersey for the securities violations in this case.

■ Brennan is also jointly and severally liable for First Jersey's violations of Exchange Act Section 10(b) and Rule 10b–5 because Brennan was a "control person" of First Jersey. Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (1993) provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same

---

24. Since, as the trial record makes clear (Brennan's testimony to the contrary notwithstanding), Brennan at all times regarded the units and their components as one and the same, Brennan's exchange with the Court on a collateral subject is illuminating:

THE COURT: Suppose First Jersey, had in fact bought the common at $1 a share on the

19th.... It then sells that common at 2–¼ a share on the 22nd. Would you regard telling the customer the fact that we picked it up three days ago at $1 to be a material fact in connection with that sale?

THE WITNESS: It is not material, it is irrelevant to the customer.

extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

I have already ruled that the Commission has standing to proceed under § 20(a) of the Exchange Act. *See SEC v. First Jersey Securities, Inc.*, 876 F.Supp. 488 (S.D.N.Y. 1994). Section 20(a) permits a plaintiff who can plead and prove a securities violation by a "controlled" person to shift to the "controlling" defendant the burden of proving that he acted in good faith and did not, directly or indirectly, induce the violation. The requisite control can be shown by a number of factors, including stock ownership, an employment or supervisory relationship, or the receipt of commissions on the controlled person's securities transactions.

This burden-shifting of § 20(a) has found approval in *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), where the Court stated that:

... While the precise standard of supervision required of broker-dealers to make good the good faith defense of § 20(a) is uncertain, where, as in the present case, the erring salesman completes the transactions through the employing brokerage house and the brokerage house receives a commission on the transactions, the burden of proving good faith is shifted to the brokerage house....

*Id.* at 716 (citations omitted).

Following *Marbury*, and consistent with the plain language of the statute, the weight of authority, which I follow, holds that once a plaintiff has proved a primary violation of the securities laws, as well as the fact that the primary violator was controlled by another, sometimes referred to as "control by status", § 20(a) shifts to the controlling person the burden of proving that he should not share the liability of the primary violator. *Food and Allied Service Trades Dep't, AFL–CIO*

*v. Millfeld Trading Co., Inc.*, 841 F.Supp. 1386, 1389–91 (S.D.N.Y.1994); *Mecca v. Gibraltar Corp.*, 746 F.Supp. 338, 347–48 (S.D.N.Y.1990); *Borden, Inc. v. Spoor Behrins Campbell & Young*, 735 F.Supp. 587, 588–91 (S.D.N.Y.1990).

Thus, as president, chief executive officer, director, and sole shareholder of First Jersey, Brennan possessed control over every aspect of First Jersey's operations. Indeed, Brennan at trial virtually conceded that he was a controlling person of First Jersey for purposes of § 20(a). Accordingly, the Commission has more than made out a *prima facie* case of "control person" liability on Brennan's part.

Section 20(a) provides that a controlling person may escape liability if he can show that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." As previously noted, the burden of proof with respect to this defense lies with Brennan. *Marbury Mgmt. Inc. v. Kohn*, 629 F.2d at 716; *see also Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 & n. 25 (9th Cir.1990), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991).

In the ordinary case involving erring securities salesmen, the controlling defendant must "show at least that [he] has not been negligent in supervision ... and that [he] has maintained and enforced a reasonable and proper system of supervision and internal control over sales personnel...." *Marbury Mgmt.*, 629 F.2d at 716.

In this case, as in *Drobbin*, 631 F.Supp. 860, 886 (S.D.N.Y.1986), I need not decide whether defendant Brennan was required to rebut negligence or merely to establish that he did not act recklessly; Brennan's proof fails to demonstrate "good faith" and non-inducement under any standard. *Hollinger v. Titan Capital Corp.* makes clear that simply *having* procedural manuals on a bookshelf, as First Jersey did, is insufficient to support a "good faith" defense.[25] Those su-

---

**25.** As the testimony before me revealed, First Jersey's procedural manuals were hardly more than "window dressing". The salesmen were not directed to follow them; they didn't follow them; and some hardly knew they existed. Equally "window-dressing" were such things as First Jersey's annual questionnaires the salesmen were required to answer. "Correct" answers

pervisory procedures must be shown to have been adequate and enforced by the "controlling" defendant:

> [T]he broker-dealer cannot satisfy its burden of proving good faith merely by saying that it has supervisory procedures in place, and therefore, it has fulfilled its duty to supervise. A broker-dealer can establish the good faith defense only by proving that it "maintained and enforced a reasonable and proper system of supervision and internal control". Accordingly, the district court erred in ruling that because "Titan had adopted rules for accepting investment payments and for supervising a contractor's compliance with securities laws and regulations," it had satisfied its duty to supervise.... Should Titan choose to rely upon the good faith defense, then it must carry its burden of persuasion that its supervisory system was adequate and that it reasonably discharged its responsibilities under the system.

*Hollinger*, 914 F.2d at 1576 (citations omitted).

In this case, First Jersey's compliance procedures and manuals were never intended for more than appearances should an occasion such as this arise. Eyerman, First Jersey's Director of Compliance, though not conceding that the illegal markups were made, acknowledged that in any event, the firm's procedures for reviewing markups would never have detected the enormous illegal markups which, it is clear, were made here.

### First Jersey and Brennan's Regulatory Agency Brushes

Highly material to determining the relief appropriate here is the fact that over many years there have been numerous other securities regulatory proceedings involving First Jersey, Brennan and other principals and associates.

From July 8 until August 7, 1973, Brennan was suspended from the sale of mutual funds by the New Jersey Bureau of Securities. Anthony Nadino, head trader for First Jersey at all times relevant to this case, was Brennan's brother-in-law, and in 1974, Nadino was federally enjoined from further violations of the antifraud provisions of the securities laws based upon his promulgation of false and misleading quotations and manipulation of the market while employed at another broker-dealer prior to coming to First Jersey. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 810–11, 814 (2d Cir.1975). Brennan was aware of this when he hired Nadino to work at First Jersey. In 1984, First Jersey and Brennan consented to the entry of Final Judgments of Permanent Injunction by Consent in *SEC v. First Jersey Sec., Inc., Robert E. Brennan, et ano,* No. 83 Civ. 0483 (MP), 1984 WL 2663 (S.D.N.Y. Nov. 20, 1984), in which First Jersey and Brennan were

> permanently enjoined, directly or indirectly, by the use of any means of instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with a particular distribution of any security, either alone or with one or more other persons, from bidding for or purchasing for any account in which [defendant] has a beneficial interest, any security which is the subject of such distribution, or any security of the same class and series, or any right to purchase any such security, or to attempt to induce any person to purchase any such security or right until after [defendant] has completed [defendant's]

---

were regarded as a condition of employment. Significantly, one of First Jersey's branch managers, Leonard Alsfeld, testified:

> THE COURT: Take [questionnaire question] 21, "Have you always told your customers all the material facts about a company prior to purchase and sale order?" Did anybody ever answer that "no"?
> THE WITNESS: Never.
> THE COURT: Question 22. "Throughout your employment at First Jersey, has First Jersey management always required you to learn your customers' financial objectives and circum-

stances prior to your making any purchase offer sale recommendation?" Did anybody ever answer that "no"?
> THE WITNESS: No, sir.
>
> \* \* \* \* \* \*
>
> THE COURT: You said, look, you have to tell your customers all about the material facts here, all about the risk. Suppose he doesn't do it. Do you think he is going to put down "no" in answer to this? ... You would fire him in two minutes, right?
> THE WITNESS: Those are valid points.

participation in such distribution, in violation of § 10(b) of the Exchange Act, 15 U.S.C. 78j(b), as defined by Rule 10b–6, as amended, 17 C.F.R. § 240.10b–6 thereunder.

First Jersey was also ordered to permit a court-appointed consultant to review First Jersey's sales practices, business operations and supervisory procedures and to implement the consultant's recommendations following his review.

In 1986, the National Association of Securities Dealers accepted an offer of settlement in a proceeding entitled *Market Surveillance Committee v. First Jersey Sec., Inc., Robert E. Brennan, and Anthony Nadino,* Complaint No. MS–261, concerning markups in Transnet warrants, in which (1) Brennan was censured, fined $25,000, and suspended from being associated with any NASD member for 10 business days in all capacities; (2) Nadino was censured, fined $25,000, and suspended from being associated with any NASD member for 10 business days in all capacities; (3) First Jersey was censured, fined $300,000, and obligated to promptly implement the recommendations of the Consultant appointed in *SEC v. First Jersey and Brennan, supra.*

During 1987, defendants First Jersey, Robert E. Brennan, and John Dell entered into a Stipulation of Settlement in an action entitled *Spatola, et al. v. First Jersey Securities, et al.,* M.D.L. No. 681, No. 85 Civ. 6059 (E.D.Pa.1987), alleging that defendants created actual or apparent active trading in, charged excessive markups and markdowns in, and artificially inflated the price of, securities sold by First Jersey, in which First Jersey agreed to pay $10,000,000 to the plaintiff class.

In 1990, the NASD accepted an offer of settlement in a proceeding entitled *District Business Conduct Committee v. First Jersey Securities, Inc., Robert E. Brennan, John E. Dell, Frederick A. Eyerman, et al.,* Complaint No. NEW–619 (Sept. 24, 1990), concerning violations of the NASD's Rules of

Fair Practice, in which (1) First Jersey was censured and fined $50,000, and (2) Brennan, Dell, and Eyerman were censured.

### First Jersey's securities activities since January 31, 1987.[26]

Following January 30, 1987, when it sold the bulk of its retail offices to Sherwood Capital Corporation, First Jersey continued to be a broker-dealer registered with the Commission pursuant to § 15 of the Exchange Act, and it and Brennan continue to maintain offices at 50 Broadway in New York City. In April 1987, Roger Barnett, formerly the secretary-treasurer and chief financial officer of First Jersey, became President of First Jersey.

Since January 31, 1987, First Jersey has continued to buy and sell securities for its own account with "Dealer Inventory and Investment Gains" in some years in the millions.

On January 17, 1991, First Jersey extended a $400,000 loan to Franklin N. Wolf, the President of the brokerage firm F.N. Wolf & Co. On September 3, 1991, First Jersey paid $4,300,000 to Hibbard Brown & Co., a broker-dealer (which firm figures prominently in a transaction set forth hereafter) for the purchase of securities by Brennan. On September 16, 1991, First Jersey extended a $300,000 loan to Hibbard Brown & Co.

### Brennan's Securities Activities Since January 31, 1987

Since January 31, 1987, Brennan has continued to own 100 percent of the issued and outstanding stock of First Jersey and continued to be a director of First Jersey. Until November 4, 1993, Brennan continued to be registered with the NASD as a person associated with First Jersey. Brennan is the sole shareholder, a director, and President/Treasurer, and Barnett is Vice–President/Secretary, of Austin Bernet, Inc., a New Jersey corporation with its principal place of business at 340 North Avenue, · Cranford, New Jersey. Brennan and Barnett are the

---

**26.** Up to February 22, 1995, when First Jersey *after* closing arguments before me filed a "Request for Withdrawal from Broker–Dealer Registration" with the SEC, and NASD, but obviously with this ruling *sub judice,* I note that on the form in response to the question, "Is [First Jersey] now the subject of ... any complaint ...?" First Jersey's present president Roger Barnett has submitted the sworn answer, "No."

sole officers and directors and make all decisions on behalf of Austin Bernet (whose activities are extensively detailed hereafter).

In 1988, Hibbard Brown & Co. purchased from Sherwood Securities the retail offices that First Jersey had sold to Sherwood in 1987, and also assumed Sherwood's obligation to maintain First Jersey's and Brennan's office space at 50 Broadway. Austin Bernet, with Brennan's approval, has made overnight broker loans to Hibbard Brown and has also extended longer-term loans to Hibbard Brown for as much as $4.5 million. In 1988, Brennan initially discussed with Peter Hibbard, a principal of Hibbard Brown, a possible investment by Brennan in Hibbard Brown. That investment was not made; however, in mid–1988, Brennan personally lent some $5 million to George Stamos for the purpose of assisting in Stamos' investment in Hibbard Brown. Stamos, who had represented Brennan in various projects, had been one of the first investors in First Jersey in the 1970s. Several months after the said loan to Stamos, Mickey Hart, another associate of Brennan, assumed the equity portion of Stamos' investment in Hibbard Brown as well as approximately $2 million of Stamos' debt to Brennan. Brennan, through Austin Bernet, also provided more than $200,000 in collateral to Leonard Greer, who had handled the First Jersey account at Paine Webber at a time when Greer was seeking to purchase L.C. Wegard & Co., another securities brokerage firm. Companies in which Brennan has an interest have lent money, ranging from a few hundred thousand dollars to $1–2 million, to L.C. Wegard since Greer took the firm over. On August 20, 1991, Austin Bernet sold Leonard Greer 350,000 common stock purchase warrants of Site–Based Media, Inc. in exchange for a $400,000 promissory note from Greer. On that same day, Austin Bernet also sold Greer 300,000 shares of Nacoma Consolidated Industries, Inc. in exchange for a $600,000 promissory note from Mr. Greer. On November 25, 1991, Austin Bernet repurchased the 350,000 Site–Based warrants from Mr. Greer for $2,100,000 and Greer repaid both of his August 1991 promissory notes. On July 26, 1993, Austin Bernet sold L.C. Wegard 100,000 shares of Sanyo Industries, Inc. for $300,000 plus 200,-000 warrants of U.S. Transportation Systems, Inc. and 500,000 common shares of Thermodynetics, Inc. Brennan closed his July 26, 1993 letter to L.C. Wegard confirming that transaction by stating:

As we discussed, we would be happy to entertain "size" bids on Creative Resources, Poseidon Pools, Dreamcar Holdings, News Communications, Stateswest Airlines and International Microelectronic Products. These securities are available subject to prior sale. Please let us know if you need any additional information about any of these companies.

Brennan is the controlling stockholder and a director of FJS Properties, Inc., which is the managing general partner of FJS Properties Fund I.L.P., a publicly-owned entity.

Brennan is the owner, president, and a director of Due Process Stable. In September 1991, Due Process Stable sold Hibbard Brown 22,000 options entitling the firm to buy 2.2 million shares of Site–Based Media, Inc. In October, Due Process Stable sold Hibbard Brown additional options entitling the firm to buy 4.4 million Site–Based warrants.

Brennan is the Chief Executive Officer and sole shareholder of Hartley Bush Financial Corp. Hartley Bush, a New Jersey corporation has its principal place of business at 340 North Avenue, Cranford, New Jersey, where Austin Bernet has its offices.

Brennan is Chairman of the Board of International Thoroughbred Breeders, Inc. ("ITB"), a publicly-held corporation which trades on the American Stock Exchange. As of December 30, 1992 Brennan was Chief Executive Officer as well as Chairman of ITB, and owned 4.3 million shares of the company's stock.

On June 19, 1987, Brennan acquired 16,-899,000 shares or 46.1% of the common stock of Chefs International, Inc., a publicly-owned company in whose securities First Jersey made a market. As of June 29, 1990, Brennan owned 17,399,000 shares of Chefs International common stock and is its largest shareholder. As of August, 1993, Brennan was effectively able to elect all of Chefs' directors and control its affairs. In the sum-

mer of 1993, Brennan recommended that Chefs make a unit offering and assisted Chefs in finding an underwriter.

On February 19, 1991, Brennan acquired 16,000,000 shares of the common stock of CCC Franchising Corporation. Brennan thus became the majority shareholder of CCC Franchising. CCC Franchising is a publicly-held company that trades on NASDAQ. The President of CCC Franchising is Andrew C. Alson, who is also the President of FJS Properties, Inc. mentioned above. Brennan has personally guaranteed obligations of CCC Franchising, including its notes for a corporate acquisition. Brennan sold 2,000,000 of his CCC common shares in May 1991, 2,000,000 more in December 1991, 400,000 more in April 1992, and 300,000 more in September 1992. In February 1992 Brennan, through Hartley Bush, received 5,000,-000 warrants to purchase common stock of CCC Franchising as consideration for the posting, by a corporation wholly owned by Brennan, of collateral for a $30,000,000 bank loan to a wholly-owned subsidiary of CCC. In May 1992, Hartley Bush distributed those 5,000,000 warrants to Brennan. In June 1992, Brennan received an additional 2,000,-000 warrants to purchase CCC Franchising common stock as consideration for the delivery of Brennan's guaranty with respect to a $20,000,000 obligation of CCC. As of October 1992, Brennan owned 46% of the common stock of CCC Franchising. In January 1993, Brennan participated in a public offering by CCC Franchising of 7.5 million shares, underwritten by F.N. Wolf & Co. Brennan is still a major shareholder of CCC Franchising today.

During 1991, CCC Franchising loaned money to Digital Products Corp. In June 1993, CCC Franchising, which had owned various securities of Digital Products since January 1991, sold 1,100,000 warrants to purchase Digital Products common stock at $1.25 per share, plus 1,000,000 shares of Digital Products common stock, to Digital Products for $10,000,000 plus 2,000,000 warrants to purchase Digital Products common stock at $0.00 per share. Brennan played a significant role in CCC Franchising's acquisition of Primedex Corporation, (of which more

hereafter) including introducing two of Primedex's officers to CCC Franchising, performing some of the "due diligence" for the acquisition, and putting up a substantial percentage of the purchase price. On November 20, 1992, CCC Franchising changed its name to Primedex Health Systems, Inc. Roger Barnett was installed as an officer of Primedex. As of May 28, 1993, Primedex was the majority shareholder of Immunotherapeutics, Inc., which is a publicly-held company that trades on the over-the-counter market.

On October 25, 1991, Austin Bernet purchased 314,325 shares, or 9.9%, of the common stock of First State Financial Services, Inc. From at least February 23, 1991 until at least May 29, 1992, Austin Bernet maintained a securities trading account at Dominick & Dominick, a registered broker-dealer, in which Austin Bernet bought and sold securities of Future Funding Corporation, Digital Products Corporation, Great American Recreation Inc., Site–Based Media Inc., S L Resources, Nacoma Consolidated Industries Inc., Officeland, Inc., Unified Capital, and Treats International Enterprises. From at least January 28, 1991 through at least September 27, 1991, Austin Bernet maintained a securities trading account at Adler, Coleman & Co., Inc., a broker-dealer, in which Austin Bernet purchased and sold securities of Future Funding Corp., Nacoma Consolidated Industries, PDK Labs, Inc., and Site–Based Media Inc. As of March 6, 1992, Brennan owned 2,458,663 shares of the common stock of Bally Manufacturing Corporation, a publicly-owned company.

On May 19, 1992, the Securities and Exchange Commission issued an order suspending trading in the securities of Treats International Enterprises, Inc. because of a lack of current and accurate information regarding the identity of persons having undisclosed control of the company and beneficial ownership of the company's securities. Thereafter, Treats filed a Form 10–K which disclosed that Austin Bernet and three Brennan family trusts owned, in the aggregate, 96% of Treats's Class A warrants, 96% of Treats' Class B warrants, and 6.67% of Treats' common stock. During 1992 or early

1993 Austin Bernet loaned Treats approximately $1 million. As of June 30, 1993, Austin Bernet and the Brennan family trust collectively owned 4,656,998 shares, or 23.95% of Treat's common stock. On November 6, 1992, the New Jersey Bureau of Securities withdrew the exemption under which Treats securities were sold in that state, on the ground, among others, that Brennan's interest in the company had not been disclosed.

During February and April 1991, Austin Bernet purchased 1,450,000 units of Future Funding Corporation at prices ranging from 10 cents to 11½ cents per unit. Thereafter, Future Funding Corporation changed its name to Site–Based Media, Inc. During August and September 1991, Austin Bernet sold the said 1,450,000 Site–Based units for $4.00 per unit through an intermediary to Hibbard Brown which not only has offices in Brennan's building but Hibbard Brown pays for the office space used by First Jersey, and where at that point Nadino was then Hibbard Brown's head trader.[27] Finding illegal markups, the NASD ordered Brown to make restitution of some $8,700,000, and Nadino was fined $150,000 and barred from employment with any NASD member.[28] The NASD Hearing Panel in its 1994 decision stated:

> We have no doubt of the responsibility for the mark-up violations by both [Brown and Nadino]. Rather, the evidence demonstrates that they engaged in retail sales to customers at inflated prices based upon their knowledge that they could purchase units from Brennan at the equivalent of $1.115 per share of common. HIBB's customers were purchasing SITE common, based upon the recommendation authorized by Brown at prices of $2.25 to $3 when both Brown and Nadino knew that the short would be covered by stock at $1.115.

The outlines of the foregoing findings of the NASD Hearing Panel were in fact acknowledged by Brennan on this trial notwithstanding his belligerent evasiveness over some 72 pages of cross-examination.[29] Thus, I conclude without hesitation that Brennan knowingly negotiated the sale to Nadino of Site–Based Media units which were then broken out to cover Nadino's earlier short sales of common:

> THE COURT: I know the transactions may have been with Adler Coleman. But according to Mr. Nadino's [NASD] testimony, who is your brother-in-law, he negotiated the purchase of the units.
>
> THE WITNESS: He may have. I can't— he didn't negotiate with me.
>
> THE COURT: Are you telling me that you had no idea, when your brother-[in-law] was negotiating the purchase of these units, that the units were going to end up with your brother-in-law?
>
> THE WITNESS: Am I telling you that?
>
> THE COURT: Yes. Are you telling me that?
>
> THE WITNESS: I am telling you that, unequivocally.
>
> BY MR. KREITMAN:
>
> Q. Mr. Brennan, who did you think Tony Nadino was representing in those negotiations?
>
> A. I had no idea that Tony Nadino was representing anybody. I had no idea that Tony Nadino was involved in this particular sequence of transactions until many, many, months later, when an issue was raised that was heard by the NASD business district conduct committee.

Brennan acknowledged knowing that there was a subsequent adverse ruling by the NASD Panel as to Brown and Nadino. The foregoing was further supported on this trial by the records of Adler, Coleman & Co. The parallelling echoes of the transaction in the above Hibbard Brown case to the transactions in this case are patent, with clear appli-

---

27. Austin Bernet also has a relationship with Hibbard Brown under which Austin Bernet loans it short-term money from time-to-time.

28. The authenticity of the NASD decision was conceded by defense counsel Dumont, Livelli and participating counsel Lowenfels.

29. This evasive attitude permeated Brennan's entire four days of testimony, starting at the very outset where he declined to recognize his signatures on First Jersey's application to become a broker-dealer, saying "... I can't be certain" and "... I don't recall it...."

cability to the injunctive and disgorgement relief sought by the SEC herein.

The NASD Panel also observed that "Brennan, Brown and Nadino all denied that the purchase of units [from Brennan's Austin Bernet] was prearranged[,]" but rejected these denials,[30] as do I. Taking all its trading in Site–Based Media together, Austin Bernet made a profit, according to Brennan on this trial, in excess of $25 million. In October 1992, the New Jersey State Bureau of Securities suspended trading in Site–Based shares in the State of New Jersey.

Austin Bernet and three Brennan family trusts have held positions in Sanyo Industries, Inc. In December 1992, the Securities and Exchange Commission suspended trading in Sanyo securities in view of questions about the adequacy and accuracy of publicly-disseminated information concerning, among other things, the identity of persons having control of Sanyo and the beneficial ownership of that company's securities.

As emerges from the foregoing, First Jersey may no longer be Brennan's first instrument of choice, but he has numerous other firms which he either owns, controls, or at which he has associations through which he has the power to and does continue his activities in the securities field, some cases still leading to state and federal suspensions of trading attributable to his conduct.

### Conclusions of Law

This Court has jurisdiction over this action under § 22(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v(a) (1993) and § 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa (1993). Certain of the transactions, acts, practices and courses of business complained of herein have occurred in the Southern District of New York and elsewhere, and venue is accordingly proper under § 22(a) of the Securities Act, 15 U.S.C. § 77v(a) (1993) and § 27 of the Exchange Act, 15 U.S.C. § 78aa (1993). Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), provides as follows:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), provides that

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

---

**30.** Brennan vigorously *agreed he had so denied*, and on this trial further denied he had even conferred with the defense before the NASD. He retracted this latter denial, however, when confronted with the transcript of the NASD hearing.

THE COURT: [Y]ou told us that you were a witness [before the NASD Panel]?
THE WITNESS: Yes, I was.
THE COURT: To say that the transaction had not been prearranged. Presumably, before you took the witness stand, you were discussing with lawyers and other people—and we had some discussion out here, Mr. Nadino is your brother-in-law, probably with Nadino, about what you were going to say when you got on the witness stand.

THE WITNESS: You are wrong on all accounts, Judge, you are wrong on all accounts. I didn't discuss it with any of the above. I went and gave testimony, because I was asked to appear.
But the next day, the NASD transcript was brought to Court and Brennan was confronted with his answer before that body which was as follows:
"I spoke with Brown and his counsel, and they interviewed with me for about a half an hour, and I met with them".
Whereupon he withdrew from his earlier answer and stated:
"They did talk to me a half hour before I testified." ...

To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated under § 10(b) of the Exchange Act, states:

It shall be unlawful for any person, directly or indirectly, by the use of any means of instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

■ The elements that the Commission must prove to show violations of these provisions are well established:

(1) a misrepresentation, or an omission (where there is a duty to speak), or other fraudulent device;

(2) in the offer or sale, or in connection with the purchase or sale, of a security; and

(3) materiality, in the case of any misrepresentation or omission.

■ For purposes of § 17(a)(1), § 10(b), and Rule 10b–5, the Commission also must prove scienter, amounting at least to recklessness,[31] on the part of the defendants; no such showing is required to prove

violations of § 17(a)(2) or 17(a)(3). *Aaron v. SEC,* 446 U.S. 680, 697, 701–02, 100 S.Ct. 1945, 1956, 1958–59 (1980).[32] With respect to each of the substantive securities laws cited above, the Commission has satisfied the jurisdictional means: "the use of any means or instruments of transportation or communication in interstate commerce or . . . the use of the mails".

Plaintiff SEC has, as set forth above, overwhelmingly proven that defendants First Jersey and Brennan with respect to the sales and resales of securities involved herein to First Jersey customers violated § 17(a), § 10(b), and Rule 10b–5 in that with scienter, they deliberately used fraudulent devices in those transactions. Specifically, First Jersey's sales practices were intended by defendants to operate, and did operate, as a pervasive fraud on First Jersey's hundreds of thousands of retail customers, as has been delineated *supra.* I accordingly turn to remedies and relief.

### Injunctive Relief

In actions such as this, the Commission appears "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 808 (2d Cir.1975). As the Supreme Court has held with regard to an analogous regulatory statute, "the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief in these cases." *Hecht Co. v. Bowles,* 321 U.S. 321, 331, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944) (referring to Emergency Price Control Act of 1942).

■ Among the factors to be considered by the Court in determining whether to grant injunctive relief are:

the degree of scienter involved, the sincerity of defendant's assurances against future violations, the isolated or recurrent nature

---

**31.** *See also IIT v. Cornfeld,* 619 F.2d 909, 923 (2d Cir.1980).

**32.** Unlike a private litigant, the Commission need not show reliance upon defendant's misrepresen-

tation, omission, or fraudulent device, nor need the Commission show damages resulting therefrom. *See SEC v. Hasho,* 784 F.Supp. 1059, 1106 n. 11 (S.D.N.Y.1992).

of the infraction, defendant's recognition of the wrongful nature of his conduct, and the likelihood, because of defendant's professional occupation, that future violations might occur.

*SEC v. Universal Major Indus. Corp.,* 546 F.2d 1044, 1048 (2d Cir.1976), *cert. denied sub nom., Homans v. SEC,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).

■ On the clear evidence in this case, defendants' repeated violations of the securities laws were "flagrant and deliberate," as opposed to merely "technical in nature." *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1228 (D.C.Cir.1989). Defendant Brennan and various former First Jersey colleagues have, over the intervening year continued to carry on business activities in the securities industry in substantial association with each other offending various federal and state securities laws, and Brennan is in a position to avail himself of future opportunities to do so.

Moreover, defendant Brennan is completely without remorse for the violations proven in this case, professing at trial that there was nothing wrong with First Jersey's pricing of the subject securities, and instead complaining that the prosecution of this action is "in a sick way, comical" and is "rooted in a malice and venom on the part of some people at the Commission".[33] These are relevant factors for the Court to weigh in determining the propriety of injunctive relief. *See SEC v. Savoy Indus., Inc.,* 587 F.2d 1149, 1168 (D.C.Cir.1978), *cert. denied sub nom., Zimmerman v. SEC,* 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979); *SEC v. Universal Major Indus. Corp.,* 546 F.2d at 1048; *SEC v. Drexel Burnham Lambert, Inc.,* 837 F.Supp. 587, 611 (S.D.N.Y.1993), *aff'd,* 16 F.3d 520 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 724, 130 L.Ed.2d 629 (1995).

■ Accordingly, concluding that it is highly likely that future violations might occur, defendants First Jersey and Brennan are permanently enjoined from further violations of Securities Act § 17(a), Exchange Act § 10(b), and Rule 10b–5.[34]

### Disgorgement

■ Disgorgement is an appropriate form of ancillary relief granted in an SEC enforcement action. *See, e.g., SEC v. First City Fin. Corp.,* 890 F.2d 1215 (D.C.Cir. 1989); *SEC v. Tome,* 833 F.2d 1086 (2d Cir. 1987), *cert. denied sub nom., Lombardfin v. S.E.C.,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988); *SEC v. Blavin,* 760 F.2d

---

**33.** These comments by Brennan on the witness stand before me, however, pale compared to his remarks, televised at a First Jersey staff dinner following the filing of this complaint, containing threats to SEC staff members and any of his own organization who turned against him:

> These people will be held accountable, and there's going to be no hiding and skirmishing. And I promise you one other thing, that if we have any people who have chosen to align themselves in a dishonest and irresponsible way with the SEC, we're going to hold them accountable, too. We're not going to let them hide behind the darkness of a barn door, and we're not going to let them hide behind anonymity. We're going to find them. We're going to locate them. We're going to put great big spotlights on them, and then we're going to put them on a witness stand under oath, and we're going to put them there under threat of going to jail if they continue to tell lies and misstatements about you and our firm.
>
> \* \* \* \* \* \*
>
> It's going to be different because this time we're going to hold the people who have filed the complaint accountable, and they're not going to be able to run away and hide just because they move from the SEC. Undoubted-

ly, they won't be working for the SEC in the 1990's when this is ultimately resolved, but the spotlight will follow them wherever they go in the form of very strong, very, very meaningful litigation, lawsuits that will hold them accountable in financial terms and in every other way through a proper system of the court processes.

**34.** First Jersey's belated withdrawal from Broker–Dealer Registration after closing arguments in this case is, viewed against the extensive and continuing history of violations here, ineffective to bar injunctive relief against it, *S.E.C. v. Bausch & Lomb, Inc.,* 565 F.2d 8, 18–19 (2d Cir.1977), where there is "positive proof of a reasonable likelihood that past wrongdoing will return in some guise." While the sale of branches in 1987 perhaps only left First Jersey with *some* business, its principals, however, continued to operate violatively under other aegises elsewhere. Brennan and First Jersey remain, and Brennan and his associates in relationships forged at First Jersey continue to conduct themselves as before, as the Site–Based Media transaction in 1991, detailed *supra* shows. The "positive proof" envisaged by *Bausch & Lomb* exists here, and I so find. *Id.* at 18.

706 (6th Cir.1985); *SEC v. Materia,* 745 F.2d 197 (2d Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *SEC v. Shapiro,* 494 F.2d 1301, 1309 (2d Cir.1974); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1104 (2d Cir.1972); *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301 (2d Cir.), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 563, 30 L.Ed.2d 558 (1971); *SEC v. Drexel Burnham Lambert Inc.,* 837 F.Supp. at 611.

"Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *First City,* 890 F.2d at 1230. *See also Blavin,* 760 F.2d at 712–13; *Tome,* 833 F.2d at 1096; *SEC v. Blatt* 583 F.2d 1325, 1335 (5th Cir.1978); *Chris–Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 390–91 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); *Manor Nursing Centers,* 458 F.2d at 1104 ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable"); *Texas Gulf Sulphur Co.,* 446 F.2d at 1308 ("It would severely defeat the purposes of the [Exchange] Act if a violator of Rule 10b–5 were allowed to retain the profits from his violation"): *SEC v. Drexel Burnham Lambert Inc.,* 837 F.Supp. at 611–12.

▆▆▆▆ The amount of disgorgement ordered "need only be a reasonable approximation of profits causally connected to the violation." The wrongdoer, who has created the uncertainty by his violation, bears the risk of uncertainty. *First City,* 890 F.2d at 1232 (citing *SEC v. MacDonald,* 699 F.2d 47, 55 (1st Cir.1983) (*en banc*)); *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 171 (2d Cir. 1980); *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946) ("the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created"). "The SEC need only offer a prima facie

reasonable approximation; . . . and the risk of uncertainty should fall on the wrongdoer." *SEC v. Drexel Burnham Lambert Inc.,* 837 F.Supp. at 612 (quoting *SEC v. Bilzerian,* 814 F.Supp. 116, 121–22 (D.D.C.1993), *aff'd,* 29 F.3d 689 (D.C.Cir.1994)). This showing has been made here. The Commission has put before me such a reasonable approximation of defendants' profits in this case, and I reject the defendants' substitute methodologies in minimization. Those profits are:

| Security | Profit |
|---|---|
| QT & T INC. | $ 581,659 |
| QUASAR | 6,302,659 |
| RAMPART | 2,110,617 |
| SEQUENTIAL | 12,111,384 |
| SOVEREIGN | 5,172,292 |
| TRANS NET | 1,009,488 |
| TOTAL | $27,288,099 |

Accordingly, I order disgorgement which, after making a $5,000,000 adjustment discussed below,[35] is in the amount of $22,288,099 together with $49,251,521 prejudgment interest as of December 31, 1994, to be updated to the date of the final judgment to be submitted herein. This disgorgement appropriately flows from the basic fact that the defendants, having engaged in a deliberate scheme to buy securities from their customers and then, within days and without disclosure, to resell those securities or components thereof to many, many thousands of other unsuspecting customers at grossly excessive prices, should be required to surrender their *entire* gross profits from that conduct, including that below the 10% allowable mark-up.

Defendants First Jersey and Brennan are jointly and severally liable for the said disgorgement, the proof showing that they both violated the securities laws together as primary violators. *See SEC v. Great Lakes Equities Co.,* 775 F.Supp. 211, 213–14 (E.D.Mich.1991), *aff'd mem.,* 12 F.3d 214 (6th Cir.1993); *SEC v. Micro–Therapeutics, Inc.,* Fed.Sec.L.Rep. (CCH) ¶ 99,086 (S.D.N.Y.

---

**35.** The settlement in *In re First Jersey Securities, Inc. Securities Litigation,* M.D.L. No. 681, Class Action 85 Civ. 6059 provided for a $5,000,000 payment to a subclass involving members who had had transactions in QT & T, Rampart and Sovereign. The $5 million was paid in January 1987 and is accordingly deducted from the gross

disgorgement here, and in the computation of prejudgment interest hereafter, no interest is assessed on that $5 million after December 31, 1986. That interest would have been $5,516,764, (*see* fn. 36 *infra*) from January 1, 1987 through December 31, 1994.

Feb. 4, 1983); *SEC v. R.J. Allen & Associates, Inc.*, 386 F.Supp. 866, 880–81 (S.D.Fla. 1974). I observe that the same result would obtain if defendant Brennan's liability were measured under § 20(a) of the Exchange Act, which explicitly provides that a controlling person who fails to establish his "good faith" defense "shall also be liable jointly and severally with and to the same extent as [the] controlled person"—in this case, First Jersey. Defendants' disgorgement liability is not divisible, and it is ordered in the amount of $22,288,099.

### Prejudgment Interest

■ An award of prejudgment interest is compelled here.[36] First Jersey's and Brennan's scienter has been fully proven as to the issues before me, and confirmed by Brennan's extensive conduct subsequent to the sale of First Jersey assets to Sherwood including the Hibbard Brown transaction in 1991. None of this would in all probability have been achievable by him without the income produced by the illegal markups and what those sums enabled him and First Jersey to further obtain,[37] and it would thus not serve justice to merely require disgorgement of $22 million and yet leave First Jersey and Brennan with its substantial—indeed comparatively enormous—fruits which, had the $22 million been put out at interest would have been some $49 million more. *Norte & Co. v. Huffines*, 416 F.2d 1189 (2d Cir.1969).

First Jersey and Brennan contend that prejudgment interest should not be awarded because—they claim—the SEC delayed the trial of this 1985-filed action to 1994. This action was assigned to me from the outset and I had neither awareness, nor did defendants make me aware of any such conduct by the SEC. I have also reviewed the docket sheets and find there no evidence to support this. Extensive discovery, including the obtaining and analysis of First Jersey's trading records and commission statements and countless depositions, was undertaken by both sides, with, I sensed, more than a pinch of acrimony. And, to the contrary of First Jersey's contention, as of early 1993, First Jersey was about to embark on a new round of discovery, having just obtained an order from the assigned Magistrate Judge to issue subpoenas duces tecum, (with presumably depositions to follow) to 142 broker-dealers for their trading records.[38] I reject any contention that the SEC delayed this case, and so should be barred from an award of prejudgment interest imposed on the disgorgement of the illegal markups.

Accordingly, prejudgment interest to December 31, 1994 is awarded as follows (to be brought up-to-date in the final judgment to be submitted hereafter):

Prejudgment interest:

| | |
|---|---:|
| QT & T INC. | $ 899,113 |
| QUASAR | 14,289,784 |
| RAMPART | 4,874,881 |
| SEQUENTIAL | 20,841,684 |
| SOVEREIGN | 11,946,416 |
| TRANS NET | 1,916,407 |
| TOTAL | $54,768,285 |
| Adjustment per fn. 35 | $5,516,764 |
| ADJUSTED TOTAL | $49,251,521 |

### The Appointment of a Special Agent

■ Finally, with defendants' violations with respect to Sovereign, Rampart, Quasar, Trans Net, Sequential, and QT & T, spanning a period of more than two years, and viewing those violations against the background of defendants' sales and business practices, I am thoroughly convinced under any standard that the particular violations proved at trial are in all probability only the tip of the iceberg. Under the law, "[o]nce the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses

---

**36.** Prejudgment interest is calculated through December 31, 1994, and is based on the standard rates (based on IRS underpayment of taxes rates) used by the Commission. *See, e.g., SEC v. Drexel Burnham Lambert Inc.*, 837 F.Supp. at 612 n. 8.

**37.** I note the over $25 million profit Brennan obtained through Austin Bernet from the Site Based Media transaction alone.

**38.** I vacated this order in May 1993 and set the case for trial, which commenced, after a substantial flurry of motions by all parties, on June 1, 1994.

the necessary power to fashion an appropriate remedy." *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d at 1103; *see also SEC v. Posner*, 16 F.3d 520, 521 (2d Cir.1994). Accordingly, I conclude that under the Court's general equitable powers, a special agent should be appointed to examine the records of defendant First Jersey Securities for the period from November 1, 1982 through January 31, 1987, for the purpose of determining whether there exists excessive markups and/or markdowns charged to FJS customers, beyond those proved at trial. Should any such excessive markups or markdowns be determined, the special agent shall recommend to the Court that defendants disgorge and pay over, as the Court may direct, all illegally-obtained profits.

█ Finally, to the extent not already determined adversely to them, defendants' remaining affirmative defenses are dismissed on the merits. I observe that laches, statutes of limitations, estoppel and waiver are not available against the SEC in enforcement actions. *SEC v. Willis*, 777 F.Supp. 1165, 1174–75 (S.D.N.Y.1991); *see also SEC v. Culpepper*, 270 F.2d 241, 248 (2d Cir.1959).

In sum, judgment is awarded to the plaintiff Securities and Exchange Commission and against First Jersey and Brennan jointly and severally directing disgorgement and prejudgment interest thereon, in the sum of $71,539,620 together with updated interest. A permanent injunction is granted as is the appointment of a special agent in all respects as set forth above, together with costs and disbursements to be taxed by the Clerk. The foregoing constitute my findings of fact[39] and conclusions of law, and are so ordered.

Submit formal judgment in accordance with the foregoing.

---

[39]. I have also, consistent with a District Court's obligation under *Apex Oil Co. v. Vanguard Oil & Service Co. Inc.*, 760 F.2d 417, 421–22 (2d Cir. 1985), contemporaneously signed certain detailed findings of fact submitted by the plaintiff, 1995 WL 366334 (S.D.N.Y.1995), having found them clearly proven.