**UNITED STATES of America,
Appellee,**

v.

**Robert E. BRENNAN, Defendant–
Appellant.**

**Docket No. 03–1367.**

United States Court of Appeals,
Second Circuit.

Argued: May 21, 2004.

Decided: Jan. 12, 2005.

Edward S. Zas, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, New York, for Defendant–Appellant.

Brian D. Coad, Assistant United States Attorney (David N. Kelley, United States Attorney, Peter G. Neiman, Assistant United States Attorney, on the brief), New York, New York, for Appellee.

Before: WINTER, STRAUB, and LAY,* Circuit Judges.

WINTER, Circuit Judge.

Robert E. Brennan appeals from Judge Owen's decision sentencing him to 36 months' imprisonment for criminal contempt, to be served consecutively to appellant's undischarged 110 month sentence for bankruptcy fraud. Appellant argues that the district court erred by: (i) imposing a consecutive rather than a concurrent sentence; (ii) wrongly calculating appellant's Criminal History Category ("CHC"); (iii) departing upwardly from the CHC; (iv) sentencing appellant under the larceny Guideline rather than the obstruction of justice Guideline; (v) including certain funds in the loss amount calculation; and (vi) denying appellant credit for acceptance of responsibility.[1] Appellant also argues that his sentence should be vacated and remanded for resentencing by a different judge.

We agree only with appellant's argument that his original CHC was wrongly calculated and remand for resentencing on that issue.[2] We do not direct the remand to a different district judge.

---

\* The Honorable Donald P. Lay, United States Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

1. After argument, the Supreme Court decided *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), which cast some doubt on the constitutionality of the Federal Sentencing Guidelines. We nevertheless apply the guidelines under *United States v. Mincey*, 380 F.3d 102, 106 (2d Cir.2004), which held that "[u]nless and until the Supreme Court rules otherwise, the law in this Circuit remains" that the federal Sentencing Guidelines are constitutional.

2. The mandate in this case will be held pending the Supreme Court's decision in *United States v. Booker*, 2004 WL 2331491, No. 04–104 (argued October 4, 2004). Should any party believe there is a need for the district court to exercise jurisdiction prior to the Supreme Court's decision, it may file a motion seeking issuance of the mandate in whole or in part. Although any petition for rehearing should be filed in the normal course pursuant to Rule 40 of the Federal Rules of Appellate Procedure, the court will not reconsider those portions of its opinion that address the defendant's sentence until after the Supreme Court's decision in *Booker*. In that regard, the parties will have until fourteen days fol-

## BACKGROUND

The facts relevant to appellant's sentencing claim arise principally from an SEC enforcement action against him, his bankruptcy, and his conviction for bankruptcy fraud.

### a) The SEC Action

Appellant was the chairman, founder, and sole owner of now-defunct First Jersey Securities, Inc. ("FJS"), a broker-dealer trading in penny stocks. In 1985, the SEC sued appellant and FJS for committing securities fraud involving about 500,000 customers. *SEC v. First Jersey Secs. Inc.*, 890 F.Supp. 1185, 1187–88 (S.D.N.Y. 1995) (the "SEC Action"). On June 19, 1995, Judge Owen found appellant and FJS guilty of fraud, granted a permanent injunction against violations of the securities laws, and ordered appellant and FJS jointly and severally to disgorge approximately $75 million—$22 million in principal and $53 million in prejudgment interest. *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1456 (2d Cir.1996).[3]

### b) The Bankruptcy and Fraud

On August 7, 1995, a few weeks after Judge Owen entered the $75 million judgment against appellant, appellant filed for bankruptcy under Chapter 11 in the District of New Jersey and became a debtor in possession. The bankruptcy court held that the $75 million judgment in favor of the SEC was nondischargeable. *See SEC v. Brennan*, 230 F.3d 65, 69 (2d Cir.2000).

Prior to trial in the SEC Action, appellant had created two offshore asset protection trusts. He consented to an order by the bankruptcy judge freezing those assets. *Id.* at 68 n. 1. Near the end of his trial in the SEC Action, appellant created a third offshore trust, the Cardinal Trust. *United States v. Brennan*, 326 F.3d 176, 180–81 (3d Cir.2003). This trust was funded by approximately $4 million in bearer bonds that appellant delivered to its trustee just before filing for bankruptcy. *Id.* Appellant did not disclose the existence of the Cardinal Trust in his original bankruptcy petition, *id.* at 181, and, when its existence was discovered, appellant valued his interest in it at $0, *SEC v. Brennan*, 230 F.3d at 68. He also did not disclose his ownership of the $4 million in bearer bonds or of about $500,000 in casino chips, which he cashed after filing for bankruptcy. *United States v. Brennan*, 326 F.3d at 181.

The assets in the Cardinal Trust grew to approximately $22 million by mid–1997. *Id.* at 194. In 1997, appellant used $12 million in assets from all three of the offshore trusts to purchase and refurbish a gambling boat, the Palm Beach Princess.[4]

lowing the Supreme Court's decision to file supplemental petitions for rehearing in light of *Booker*.

3. The court also appointed a special agent to examine whether appellant and FJS had committed additional securities violations. *SEC v. First Jersey Secs., Inc.*, 890 F.Supp. at 1213. Except for that appointment, all aspects of the district court's order were affirmed by this court. *SEC v. First Jersey Secs. Inc.*, 101 F.3d at 1479.

4. The exact dollar amounts in this regard are unclear in the record. For example, courts have said at various times that Brennan funded the Cardinal Trust with $5 million, 230 F.3d at 68, or with $4 million, 326 F.3d at 181, 194. Similarly, Brennan's interest in the Palm Beach Princess has been valued at widely varying levels: the PSR from his New Jersey bankruptcy fraud case listed it at $10 million; the PSR from this case values it at $13.75 million; and the government values it at $16 million. Brennan's interest in the ship has been valued at $12 million three times— by Brennan, by the district court in this case, and, according to the New Jersey court, by the SEC Director of Enforcement. We need not determine which of these sums is correct

The three trusts held a $12 million mortgage on the boat that appellant did not disclose in his bankruptcy filings. Appellant also continued to list his interest in the Cardinal Trust as $0, and the trust's situs was moved twice to evade detection. *Id.* at 181; *SEC v. Brennan,* 230 F.3d at 68.

Appellant was indicted and convicted in New Jersey of bankruptcy fraud for concealing the bearer bonds and casino chips and for money laundering of the bonds and their proceeds. On July 26, 2001, Judge Garrett E. Brown sentenced appellant to 110 months' imprisonment. *Id.* In calculating the loss amount under U.S.S.G. § 2F1.1, the court included not only the value of the bearer bonds and casino chips but also the $18 million in proceeds from investing these assets, giving a total loss amount of $22 million. *Id.* at 194. The court ordered restitution of $4,588,518, the value of the bearer bonds concealed by appellant. The Third Circuit affirmed appellant's conviction and sentence in all respects. *United States v. Brennan,* 326 F.3d at 201.

### c) *The April 5, 2000 Freeze Order*

In April 2000, just prior to appellant's indictment for bankruptcy fraud in New Jersey, the SEC moved before Judge Owen in the Southern District for an order to show cause why appellant should not be held in civil contempt of the $75 million disgorgement order entered in 1995. *SEC v. Brennan,* 230 F.3d at 69, 77. Judge Owen granted the motion in an order issued on April 5, 2000. The order included

the Freeze Order, which enjoined appellant and anyone working with or for him to

hold and retain within their control, and otherwise prevent any disposition, transfer, pledge, encumbrance, assignment, dissipation, concealment or other disposal whatsoever of any funds or other assets of [ ] Brennan that are not assets of his bankruptcy estate presently held by them, under their control or over which they exercise actual or apparent investment or other authority, in whatever form such assets may presently exist and wherever located.

On April 20, 2000, the district court modified the Freeze Order to allow appellant to compensate legal counsel, specifying that he could seek loans from third parties for that purpose. The loans were to be subordinated to his $75 million debt to the SEC; the third parties were to provide certifications of the source and terms of the loans; and appellant was to provide these certifications to the SEC. The SEC reserved the right to deem the Order violated if "the funds were advanced directly or indirectly by Mr. Brennan, his family or any other person related to the bankruptcy estate or against whom the bankruptcy estate is pursuing a claim." [5]

### d) *Offense Conduct—Violation of Freeze Order*

On May 11, 2001, two months before appellant was sentenced in the New Jersey bankruptcy fraud case, Judge Owen issued a Notice of A Charge of Criminal Contempt ("Notice") to appellant under 18 U.S.C. § 401(3) for violations of the Freeze Order. It was alleged that appellant failed to declare the Palm Beach Princess as one

---

because the precise value is irrelevant to the outcome. We therefore arbitrarily use the $12 million value.

**5.** The Order, besides freezing appellant's assets, required the repatriation of the assets of the Cardinal Trust and required appellant to provide an accounting of his assets to the

court. Appellant appealed only the repatriation aspect of the Order; that aspect was reversed as violative of the bankruptcy code's automatic stay. *United States v. Brennan,* 230 F.3d at 67. The remainder of the Order was not affected.

of his assets and made a "circuitous and covert transfer in June and July 2000 of $500,000 out of the vessel to [appellant's] criminal counsel" in the bankruptcy fraud case.

As noted, the Palm Beach Princess was purchased at least in part with $12 million in funds from appellant's three offshore trusts. The ship was nominally owned by MJQ Corp. On June 9, 2000, MJQ Corp. transferred $1.5 million to MJQ Development LLC. Francis Murray, a friend of appellant's, was the director of both MJQ entities at the time. On July 20, 2000, MJQ Development transferred $1.5 million to GS Strategies, LLC, which is wholly owned by Murray. Finally, on July 28, 2000, GS Strategies paid Murray $500,000 by check. Murray then transferred $500,000 to Michael Critchley, appellant's criminal defense counsel in New Jersey, later that day. The location of the remaining $1 million is unknown.

e) *Appellant's Plea Agreement and Guilty Plea*

On August 8, 2002, appellant entered into a written plea agreement regarding the criminal contempt charge. Appellant pled guilty to the May 11 contempt notice, which the plea agreement characterized as charging him "with concealing and transferring between June and July, 2000 approximately $500,000" to his bankruptcy fraud attorney. The agreement stipulated that the obstruction of justice Guideline, U.S.S.G. § 2J1.2, was the "most analogous offense guideline" and thus applied to appellant's contempt offense under U.S.S.G. §§ 2J1.1 and 2X5.1. Assuming credit for acceptance of responsibility, this resulted in an offense level of 10; with a stipulated CHC of II, appellant would face an 8 to 14 month sentence. Appellant reserved the

right to request that his sentence be imposed to run partially or wholly concurrently with his New Jersey 110 month bankruptcy fraud sentence. The agreement noted, however, that the length and other aspects of the sentence would be "determined solely by the Court." Appellant thereafter entered a plea of guilty.

f) *Appellant's November 19 Letter to Court*

On November 19, 2002, prior to his sentencing, appellant wrote a letter to Judge Owen. In the letter, appellant expressed his "categorical and unqualified remorse" for violating the Freeze Order. In an attempt to explain the circumstances of the offense, appellant claimed that, consistent with the Freeze Order, he gave the SEC copies of all the promissory notes used to secure funds for the payment of attorneys in the case before Judge Owen. However, he admitted that he did not provide the SEC with copies of the promissory notes underlying (or otherwise disclose) the "loans" to pay his criminal attorney in the New Jersey bankruptcy case because he "consciously did not want [the SEC] informed about anything to do with that matter." Appellant claimed that the $500,000 payment from Murray to appellant's lawyer was, like the loans for which appellant provided documentation to the SEC, bona fide, secured by a promissory note, and subordinated to the SEC's claim. Appellant said that he did not disclose that "loan" to the SEC because it related to his bankruptcy fraud proceeding. Appellant admitted that he violated the Freeze Order "by engaging in this transaction and not notifying the SEC." [6]

Appellant attached what he claimed was a copy of the promissory note given to Murray in exchange for the $500,000 Mur-

---

6. Appellant also noted that his trusts had provided mortgage financing for the Palm Beach Princess in 1997. Appellant knew at the time

of the "loan" that Murray was compensated as the manager of the gambling ship, and that the money could therefore "logically be

ray "loaned" to appellant. Although the "loan" occurred, if at all, in July 2000, the promissory note was dated July 31, 2001. Moreover, the note was signed only by appellant. The district court found at sentencing that appellant "fabricated" the note.

g) *Sentencing*

The sentencing proceedings consumed three days of hearings between December 2002 and June 2003. Appellant's ultimate sentence differed from the plea agreement and PSR recommendations in four ways.[7] First, the district court applied the larceny Guideline, U.S.S.G. § 2B1.1, rather than the obstruction of justice Guideline, *id.* § 2J2.1, and found a loss amount of $1.5 million. The court reasoned that the larceny Guideline was the most analogous to appellant's contempt offense because appellant's actions amounted, in essence, to stealing from assets that were set aside for his victims and creditors and giving them to his lawyer. A loss amount of $1.5 million was deemed appropriate because that amount was transferred out of the Palm Beach Princess, although appellant's lawyer ultimately received only $500,000.

Second, the court granted an upward departure under U.S.S.G. § 4A1.3(c) on the grounds that appellant's CHC of II substantially understated the seriousness of his prior similar misconduct established by civil adjudication.[8] Third, the court denied appellant acceptance of responsibility points, noting appellant's delay before pleading guilty, his fabrication of the promissory note,[9] and his lack of honesty in his admissions. Fourth, the court made the sentence wholly consecutive, rather than concurrent, to appellant's New Jersey bankruptcy fraud sentence. Based on these changes, appellant was sentenced to 36 months' imprisonment in addition to the 110 months imposed by the New Jersey court for bankruptcy fraud, rather than the 8 to 14 months suggested in the plea agreement.

## DISCUSSION

On appeal, appellant challenges his sentence, making the arguments listed in the opening paragraph of this opinion.

---

traced" to the ship. However, appellant insisted that the loan was bona fide.

7. The PSR recommended sentencing Brennan under the 2002 Guidelines. However, because the district court decided to sentence Brennan under a different Guideline than recommended by the PSR, it correctly sentenced him under the 2000 Guidelines to avoid *ex post facto* problems. Neither party challenges this decision on appeal, and we refer to the 2000 Guidelines.

8. The court also mentioned the *"McDonnell* case," which involved a $40,000 payment from the defendant to his son and a $200,000 gift from the son to the defendant. Appellant was not a party to that case, and the court did not rely on it in determining the final sentence.

9. Appellant objected to the court's denial of acceptance of responsibility points based on what the court termed the "fabricated" promissory note. Appellant argued by letter and affidavit that the $500,000 from Murray was a bona fide loan, and that appellant thought the note attached to his November 19 letter was a copy of the note he gave to Murray. Appellant also testified to that effect at a final hearing, adding that the promissory note securing the loan was in the custody of Murray's lawyers. Appellant had kept a copy of the note but did not know where it was. Appellant had therefore asked Murray to send him a copy, which appellant attached to the November 19 letter. Appellant had not noticed that the date on the note was incorrect when he sent it to the court. Appellant's counsel represented to the court that if the parties would allow Murray to provide the actual original note without waiving his Fifth Amendment privilege, Murray would provide the note. The court rejected this offer, and concluded that appellant's affidavit affirming his November 19 letter was perjured.

### a) *Consecutive Versus Concurrent Sentencing*

U.S.S.G. § 5G1.3 contains three provisions regarding the imposition of a sentence consecutively or concurrently to a prior undischarged sentence. If the conduct underlying an instant offense occurred after sentencing in a prior proceeding, the later sentence must run consecutive to the earlier sentence. U.S.S.G. § 5G1.3(a).[10] Where Subsection (a) does not apply, and where "the undischarged term of imprisonment resulted from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense," the sentences must run concurrently. *Id.* § 5G1.3(b). Finally, in cases not governed by Subsections (a) or (b), "the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." *Id.* § 5G1.3(c) (Policy Statement).

■ We review the district court's legal determination of whether to apply U.S.S.G. § 5G1.3(a), (b), or (c), *de novo. United States v. Rivers,* 329 F.3d 119, 120 (2d Cir.2003). However, "a district court's sentencing decisions under § 5G1.3(c) will not be overturned absent an abuse of discretion." *United States v. Livorsi,* 180 F.3d 76, 82 (2d Cir.1999).

### 1. The Meaning of "Fully Taken into Account"

Appellant argues that his contempt sentence should run concurrently to his bankruptcy fraud sentence under Section 5G1.3(b) or (c) because both sentences "punished the same underlying conduct or course of conduct involving [his] concealment of the same assets, over the same period of time, from courts, regulators, and creditors." Appellant relies on the fact that the funds transferred to his lawyer in the New Jersey case were drawn from the concealed assets underlying his bankruptcy fraud conviction.

The goal of Section 5G1.3 is to ensure

some coordination of sentences imposed ... with an eye toward having such punishments approximate the total penalty that would have been imposed had the sentences for the different offenses been imposed at the same time (*i.e.,* had all of the offenses been prosecuted in a single proceeding).

*Witte v. United States,* 515 U.S. 389, 404–05, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995). Nevertheless, Section 5G1.3(b)'s reference to "offense(s) that have been fully taken into account in the determination of the offense level for the instant offense" is hardly unambiguous. We reduced some of the doubt by stating that the provision means "actually accounted for." *United States v. Williams,* 260 F.3d 160, 167 (2d Cir.2001). *See also id.* ("The Guideline's language is not hypothetical or abstract; it does not refer to offenses that, in theory, could be fully taken into account. It suggests that the other offense must have been considered in fact in the defendant's sentencing."). We have also noted that the prior offense need not "have been a but-for cause of an increase in the defendant's offense level" to be deemed to have been "fully taken into account." *Id.* at 167, n. 6.

The Commission, in apparent recognition of its ambiguities, has amended Section 5G1.3(b) to state that it applies "in cases in which all of the prior offense (i) is

---

**10.** This provision is inapplicable, because the offense conduct underlying the instant proceeding occurred prior to the indictment in the prior proceeding.

relevant conduct to the instant offense ...; and (ii) has resulted in an increase in the ... offense level for the instant offense." U.S.S.G. § 5G1.3, appl. n. 2 (eff.Nov. 1, 2003). The Sentencing Commission has styled this provision as a "clarifying" amendment. *Id.* app C, amend. 660. If so, we could consider it in interpreting previous versions of the Section. *See United States v. Hendrickson,* 26 F.3d 321, 330 n. 6 (2d Cir.1994) (court can consider amendment subsequent to offense conduct that clarifies and simplifies guideline provisions). However, at least one court has held that the amendment is substantive rather than clarifying, *United States v. Rouse,* 362 F.3d 256, 261–62 (4th Cir.2004), and we note that the amendment is somewhat at odds with *Williams*'s statement that a prior offense may have been taken into account under Section 5G1.3(b) even though it was not "a but-for cause of an increase in the defendant's offense level." If the amendment is at odds with *Williams,* it might arguably be deemed substantive, and its application in the present matter might violate the *ex post facto* clause. *United States v. Brennan,* 326 F.3d at 197 (*ex post facto* clause violated when court applies change in the law which is adverse to interests of a defendant where change occurred after commission of the crime); U.S. Const., art. I § 9, cl. 3. We need not resolve this issue, however, because application of the amendment would not alter the result.

2. Application of Section 5G1.3(b)

It cannot be fairly said that Judge Owen considered all of the conduct underlying appellant's bankruptcy fraud conviction— the grounds for the earlier sentence—in sentencing for the criminal contempt offense.

■ To be sure, the money at issue in the bankruptcy fraud—the $4 million origi-nally concealed by appellant plus the $18 million in growth—was the source of the $1.5 million—the heart of the criminal contempt charge—transferred by appellant out of the Palm Beach Princess in violation of the Freeze Order. However, while the Freeze Order's requirements surely overlapped in part with appellant's obligations of full disclosure in the bankruptcy proceeding, they went beyond the original concealment of assets by appellant. They sought to preserve assets for the benefit of the SEC; they controlled the transfer or encumbrance by appellant and others of both known and concealed assets; and, most importantly, they set out a procedure by which appellant might raise and spend funds for legal counsel. Appellant was allowed to raise such funds by subordinated loans documented in certifications to the SEC. Appellant clearly violated these provisions by the transfer in question, by causing at least one-third of the money— instead of fresh cash raised by subordinated loans—to be diverted to counsel, and by failing to inform the SEC even though he was to claim—falsely—in his November 19 letter to the court that the money was a loan. While the money diverted to the MJQ entities, and in part to Murray and then counsel, was drawn from the various sums concealed from the bankruptcy court, the conduct violating the Freeze Order involved prohibited transfers after the original concealment and violations of specific provisions designed to allow appellant to retain and pay counsel. The sentence imposed on appellant was therefore based on the specific conduct violating the Freeze Order, not the original concealment of assets that underlay the New Jersey sentence.

This conclusion is fully supported by the fact that the particular conduct violating the Freeze Order was not considered by the New Jersey district court when it sen-

tenced appellant for fraud. Appellant was sentenced by the court under Section 2F1.1 of the 2000 Sentencing Guidelines, although he argued that the 1999 Guidelines applied. Under the 1999 Guidelines, appellant's sentence could not have been enhanced on the ground that bankruptcy fraud was involved, although it could have been enhanced on the ground that it violated the Freeze Order.[11] Under the 2000 Guidelines, an enhancement was authorized for either "a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding" or "a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines." U.S.S.G. § 2F1.1(b)(4)(B), (C) (2000) (deleted and consolidated with § 2B1.1 by Amendment 617, effective Nov. 1, 2001). The district court applied the enhancement under the 2000 Guidelines only for committing fraud during a bankruptcy proceeding. *See United States v. Brennan*, 326 F.3d at 197.[12]

Appellant nevertheless argues that his bankruptcy fraud and contempt sentences must run concurrently because, at sentencing, the New Jersey court "expressly noted" appellant's failure to disclose the $12 million investment in the gambling ship

and his payment of $500,000 from the ship to his attorney. In doing so, the court was reading or paraphrasing letters from the SEC's director of enforcement and from the bankruptcy trustee into the record. However, the court did not adopt the statements in the letters as findings of fact or suggest that the diversion of the $1.5 million had any effect on appellant's offense level or sentence. Moreover, while the New Jersey court mentioned these various violations of the Freeze Order, it never mentioned the Freeze Order itself; rather, the court treated the violations as more instances of bankruptcy fraud. The New Jersey court therefore indicated no appreciation of the additional, distinctive lawlessness of appellant's conduct as violating a court order designed specifically to protect the SEC and to allow appellant to retain private counsel; indeed, the court may well have been unaware of the Freeze Order's existence.

To be sure, the New Jersey Presentence Report ("PSR") noted that Brennan had been charged with criminal contempt in the Southern District of New York.[13] However, the basis for that charge—*i.e.*, the

11. The 1999 version called for an enhancement only if the offense involved a "violation of any judicial or administrative order, injunction, decree or process." U.S.S.G. § 2F1.1(b)(4)(B) (1999). Under Third Circuit precedent, this language did not include fraudulent conduct during a bankruptcy proceeding. *See United States v. Thayer*, 201 F.3d 214, 226–28 (3d Cir.1999).

12. As noted in the text, the 2000 Guidelines contained an enhancement for bankruptcy fraud. If the New Jersey district court had applied the enhancement on alternative bases—i.e. on the grounds that appellant committed fraud during a bankruptcy proceeding and that he violated a judicial order—the court would have fully taken the contempt conduct into account within the meaning of

Section 5G1.3(b). *See Williams*, 260 F.3d at 167 n. 6 (prior offense need not "have been a but-for cause of an increase in the defendant's offense level" to have been "fully taken into account"; rather, prior offense conduct must have been "considered in fact"). However, the New Jersey district court did not mention the violation of the Freeze Order in determining appellant's bankruptcy fraud offense level.

13. The New Jersey PSR also noted appellant's interest in the Palm Beach Princess, stating that he provided about $10 million in financing for the boat. However, the PSR did not refer to the transfer of $1.5 million out of the boat, or to the subsequent transfer of $500,000 to appellant's bankruptcy fraud attorney.

existence, substance, and violation of the Freeze Order—was not mentioned in the PSR. So far as the PSR informed the New Jersey court, the criminal contempt charge could have involved a wide variety of acts that had nothing to do with appellant's disposition of his various assets. For example, appellant might have misbehaved in court or violated an order of some other kind. On this record, we must conclude that appellant would have received the same sentence in the New Jersey court for the bankruptcy fraud had the $1.5 million transfer not occurred and that, had he been sentenced by that court simultaneously for violation of the Freeze Order, a higher sentence would have been imposed. Neither the language nor purpose of Section 5G1.3(b) was therefore violated by the failure to impose a concurrent sentence.

3. Propriety of a Fully Consecutive Sentence under Section 5G1.3(c)

■ As noted, we review a district court's sentencing decisions under Section 5G1.3(c) for abuse of discretion. *Livorsi,* 180 F.3d at 82. Application Note 3 of the Commentary to Section 5G1.3 states that "[t]o achieve a reasonable punishment and avoid unwarranted disparity, the court should consider the factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a))." These factors include:

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).[14]

Appellant argues that the district court failed to give an adequate explanation for imposing a consecutive sentence. But "[n]othing in the language of the guideline or its Commentary requires district courts to make specific findings with respect to any or all of the factors listed in the Commentary or § 3553(a)." *United States v. Velasquez,* 136 F.3d 921, 924 (2d Cir.1998). Moreover, the court here did make findings relevant to a Section 5G1.3(c) decision. After determining appellant's offense level and CHC, the court discussed his long criminal history and the purposes of sentencing. The court first remarked that appellant's criminal history was extensive and ongoing, even "within the last year or so," and that "I really don't see any remorse in all this." The court also noted that deterrence of others is a purpose of sentencing, and it was reluctant to send a message "that this kind of conduct, continuing long after the bankruptcy case and long after the $71 million judgment . . . does not deserve punishment."

---

14. Application Note 3 also lists four other factors of which courts should be "cognizant":

(a) the type (*e.g.,* determinate, indeterminate/parolable) and length of the prior undischarged sentence;

(b) the time served on the undischarged sentence and the time likely to be served before release;

(c) the fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and

(d) any other circumstance relevant to the determination of an appropriate sentence for the instant offense.

U.S.S.G. § 5G1.3, appl. n. 3.

Given the district court's explicit consideration of several of the Section 3553(a)(2) factors, as well as the fact that neither of appellant's sentencing proceedings accounted for the offense conduct at issue in the other, the imposition of a consecutive sentence under Section 5G1.3(c) was in no way an abuse of discretion. *See Livorsi*, 180 F.3d at 83 ("subsection (c) accords broad discretion to district courts in fashioning sentences, and we can discern no reason to upset the district court's decision, based as it was on a review of all relevant factors").

### b) *Original CHC and Upward Departure*

Appellant claims that his original CHC should have been I rather than II, and that the court's upward departure from a CHC of II to III was erroneous. We agree with his first argument but reject his second.

#### 1. Appellant's Original CHC

 Assigning appellant a CHC of II based on his "prior sentence" for bankruptcy fraud in New Jersey was error. Section 4A1.1 of the guidelines prescribes the allocation of criminal history points for each "prior sentence," defined as "any sentence previously imposed ... for conduct not part of the instant offense." U.S.S.G. § 4A1.2(a). Conduct that is part of the instant offense is defined as "conduct that is relevant conduct to the instant offense" under Section 1B1.3. *Id.* § 4A1.2 (Appl. Note 1). Finally, Section 1B1.3 defines relevant conduct as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" that "were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* §§ 1B1.3(a)(1)(A), (a)(2). *See United States v. Thomas*, 54 F.3d 73, 83 (2d Cir.1995). Thus, a sentence imposed for conduct that was part of the same course of conduct as the offense of conviction is not a "prior sentence" within the meaning of Section 4A1.1.

"Acts may be found to be part of the 'same course of conduct' if the defendant engaged in a repeated pattern of similar criminal acts, even if they were not performed pursuant to a single scheme or plan." *Thomas*, 54 F.3d at 84 (internal citation omitted). *See also United States v. Perdomo*, 927 F.2d 111, 115 (2d Cir. 1991) ("The 'same course of conduct' concept ... looks to whether the defendant repeats the same type of criminal activity over time. It does not require that acts be 'connected together' by common participants or by an overall scheme."); *United States v. Butler*, 970 F.2d 1017, 1025 (2d Cir.1992) (acts of arson and assault in aid of a scheme of extortion against a given victim, though different in kind, could support a finding of common scheme or plan).

Appellant's bankruptcy fraud and criminal contempt were part of the "same course of conduct," in that they constituted "a repeated pattern of similar criminal acts." *Thomas*, 54 F.3d at 84. All involved concealing, laundering, investing, and using of appellant's assets for appellant's own purposes without the knowledge or consent of the bankruptcy estate or appellant's judgment creditors. The court therefore erred in imposing criminal history points on appellant based on the New Jersey bankruptcy fraud sentence, and his original CHC should have been I.

We note in this regard that the government's only response on the merits to appellant's argument is a footnote stating that the argument fails for the same reasons that Section 5G1.3(b) does not mandate a concurrent sentence. However, the standard of whether conduct is part of a course of conduct or a repeated pattern is not the same as the standard of whether

conduct was "fully accounted for" by a sentencing court. Indeed, the recent amendment to Section 5G1.3(b) discussed above recognizes that very distinction by stating that concurrent sentences are mandatory when the prior offense is "relevant conduct to the instant offense" *and* actually resulted in an increased offense level for the instant offense.

■ There is a procedural problem with appellant's argument, however. Appellant failed to object to the CHC of II at sentencing, and we may overturn the determination only if it constitutes plain error. *See* Fed.R.Crim.P. 52(b); *United States v. Whab*, 355 F.3d 155, 158 (2d Cir.2004). To establish plain error, appellant must show not only that the error occurred and was plain—requirements that he has met—but also that it affected substantial rights. *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Finally, even if appellant satisfies these three requirements, correcting the error is within our discretion, which we "should not exercise ... unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted, alteration in original). However, we have previously remanded an incorrect CHC determination as plain error where that determination might have affected a defendant's sentence. *United States v. Walker*, 142 F.3d 103, 115 (2d Cir.1998).

■ In this case, it is possible that appellant's incorrect CHC calculation affected his substantial rights by subjecting him to a longer sentence than he would otherwise have received. In light of *Walker*, we exercise our discretion to redress a plain error and find that appellant's original CHC was I. A remand for resentencing is therefore necessary.

## 2. Upward Departure Based on Administrative Adjudications

Whether the alteration in appellant's CHC will affect his sentence depends upon the availability and extent of an upward departure. Having upwardly departed from a CHC of II, the district court can be expected to depart again based on a CHC of I, and, in the interests of judicial economy, we address appellant's arguments that any departure is error as a matter of law.

■ We review a court's decision to depart *de novo*. *United States v. Butler*, 954 F.2d 114, 121 (2d Cir.1992). The district court's decision to depart upwardly from appellant's CHC of II, based on prior civil adjudications, was not error.

■ Section 4A1.3(a)(1) includes a policy statement that "[i]f reliable information indicates that the [CHC] does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range." The Guideline lists five types of reliable information that a district court may consider in reaching its conclusion, including "prior similar misconduct established by a civil adjudication or by a failure to comply with an administrative order." *Id.* § 4A1.3(c). The Guideline's example of such misconduct is "a similar instance of large scale fraudulent misconduct established by an adjudication in a Securities and Exchange Commission enforcement proceeding." *Id.* § 4A1.3. The Guideline does not define "similar," but we have held that "prior conduct need not have been of an identical type." *United States v. Mayo*, 14 F.3d 128, 131–32 (2d Cir. 1994) (fraudulently obtaining loans and arson similar where purpose of arson was, like purpose of obtaining loans, "to

disadvantage financial institutions in their loan dealings with" defendant).

In determining that appellant's CHC underrepresented the seriousness of his criminal history, the district court relied on: (i) its own finding in the SEC Action that appellant defrauded his hundreds of thousands of customers; and (ii) five prior instances in which appellant agreed to civil sanctions including suspensions, censures, fines, and injunctions. *SEC v. First Jersey Securities*, 890 F.Supp. at 1203–04. Appellant argues that he never admitted wrongdoing in those five instances and that as a matter of law they cannot be deemed "reliable information" under Section 4A1.3. This argument is entirely meritless [15] and is irrelevant in any case, because the massive fraud underlying the SEC Action itself certainly constitutes "a similar instance of large scale fraudulent misconduct established by an adjudication in a Securities and Exchange Commission enforcement proceeding" sufficient to merit an upward departure. U.S.S.G. § 4A1.3.

Because we do not have before us the issue of the reasonableness of the extent of any upward departure—to be determined on remand—we need not address it, other than to say that nothing in this opinion necessarily precludes a reimposition of the original sentence. This issue can be reviewed if and when it arises. *See United States v. Cox*, 299 F.3d 143, 146 (2d Cir. 2002) (reviewing extent of departure for reasonableness).

c) *Application of the Larceny Guideline and Calculation of Loss Amount*

The Sentencing Guidelines direct that courts "apply the most analogous guideline" to criminal contempt offenses. U.S.S.G. §§ 2J1.1, 2X5.1. We affirm the district court's determination that the larceny Guideline was the most analogous, as well as the court's loss amount finding.

1. Use of Larceny Guideline

■ We generally review a district court's selection of an applicable guideline de novo. *United States v. Cefalu*, 85 F.3d 964, 968 n. 6 (2d Cir.1996). "However, the determination under USSG § 2X5.1 as to whether there is a single 'most analogous offense guideline,' and, if not, how to proceed under 18 U.S.C. § 3553(b), involves the application of a guideline to the facts of a case, and 18 U.S.C. § 3742(e) mandates that we give 'due deference' to such applications by the district court, rather than review them *de novo*." *Id*; *see also United States v. Versaglio*, 96 F.3d 637, 638 (2d Cir.1996) (determination of most analogous offense guideline is "predominantly an application of a guideline to the facts, a decision to which we should give due deference").

The court applied the larceny Guideline because it found that appellant's contumacious conduct amounted to stealing money from the Palm Beach Princess that should have gone to his victims or creditors. We

---

**15.** Even if the five instances listed in the opinion in the SEC Action do not constitute adjudications of wrongdoing in an SEC enforcement proceeding, the court properly considered them in upwardly departing. The five upward departure factors listed in Section 4A1.3 are not exhaustive, and a sentencing court may consider information outside them as a basis for departure "as long as the information is reliable." *United States v. Cox*, 299

F.3d 143, 147 (2d Cir.2002). *See also United States v. Larson*, 112 F.3d 600, 605 (2d Cir. 1997) ("So long as the sentencing court does not rely on misinformation, its discretion is largely unlimited either as to the kind of information [the court] may consider, or the source from which it may come.") (internal citation and quotation marks omitted, alteration in original).

agree.[16] An application note to the contempt Guideline specifies that "[f]or offenses involving the willful failure to pay court-ordered child support (violations of 18 U.S.C. § 228), the most analogous guideline is § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft). The amount of the loss is the amount of child support that the defendant willfully failed to pay." U.S.S.G. § 2J1.1, appl. n. 2. Appellant's principal argument against application of the larceny guideline is that it does not apply to misappropriation of one's own property. However, Application Note 2 specifically contemplates using the guideline for such misappropriation. Furthermore, the larceny guideline has been used to sentence those convicted of theft of property held in trust for another. *United States v. Nolan,* 136 F.3d 265, 267–68, 273 (2d Cir.1998) (embezzlement of pension funds by pension fund manager); *United States v. Arjoon,* 964 F.2d 167, 168–69 (2d Cir.1992) (embezzlement by bank employee of stock held by bank as collateral for loan). *But see United States v. Tankersley,* 296 F.3d 620, 621–22 (7th Cir.2002) (applying obstruction of justice guideline to a criminal contempt offense where the defendant sold his own yacht, which was subject to freeze order in underlying civil case, and hid proceeds of sale).

Although the obstruction of justice Guideline is frequently used as the Guideline most analogous to a contempt offense, the application note to Section 2J1.1 states only that "[i]n certain cases, the [contemptuous] offense conduct will be sufficiently analogous to § 2J1.2 (Obstruction of Justice) for that guideline to apply." U.S.S.G. § 2J1.1, appl. n. 1. "[C]ourts cannot be bound to sentence under the Obstruction of Justice Guideline any time they find an intent to obstruct justice." *Cefalu,* 85 F.3d at 968. Rather, a court may consider, *inter alia,* (i) whether the contumacious conduct resembles the offenses listed in the obstruction guideline and (ii) whether the lack of flexibility of the obstruction guideline is suited to adequately punishing the contempt offense. *See id.* at 967.

The Background section of the obstruction of justice guideline describes the "[n]umerous offenses of varying seriousness" that may constitute obstruction of justice as follows:

> using threats or force to intimidate or influence a juror or federal officer; obstructing a civil or administrative proceeding; stealing or altering court records; unlawfully intercepting grand jury deliberations; obstructing a criminal investigation; obstructing a state or local investigation of illegal gambling; using intimidation or force to influence testimony, alter evidence, evade legal process, or obstruct the communication of a judge or law enforcement officer; or causing a witness bodily injury or property damage in retaliation for providing

---

**16.** We reject appellant's argument that the larceny Guideline is inapplicable because he pled guilty only to a technical violation of the Freeze Order—failure to notify the SEC of the loan from Murray—rather than to knowingly taking $500,000 out of the Palm Beach Princess and giving it to his lawyer. During his guilty plea allocution, appellant specifically stated that he wished to plead guilty to the Notice, which alleged a "circuitous and covert transfer in June and July 2000 of $500,000 out of the [Palm Beach Princess] to [appellant's] criminal counsel." Appellant admitted that "[a]t the time of this $500,000 transfer, I knew that the source of the money could be traced to the Florida [gambling ship], which had been acquired, at least in part, with money received from the three trusts that I created and funded ...." Appellant later reiterated his understanding that "the source of the funds that create this issue for me today" was the trust money invested in the ship. Finally, appellant stated that he violated the Freeze Order by "instructing the transfer of the funds to [his] attorney."

testimony, information or evidence in a federal proceeding. The conduct that gives rise to the violation may, therefore, range from a mere threat to an act of extreme violence.

U.S.S.G. § 2J1.2 (Background). Appellant's conduct—transferring money frozen by a court order for the benefit of a party to litigation—closely resembles none of these examples, all of which describe conduct that actually and directly seeks to hinder or corrupt a judicial proceeding. Appellant's conduct sought to deprive a party of the benefit of such a proceeding and, as the district court pointed out, was more akin to stealing from creditors than hindering or corrupting the proceeding.

Also, the obstruction Guideline is insufficiently flexible to deal with a contempt offense such as appellant's, which may be of widely varying degrees of seriousness depending on the amount of money transferred. If the obstruction Guideline were applied to his contempt offense, appellant's offense level would be the same whether he removed $12 or $12 million from the Palm Beach Princess. Appellant's punishment thus fits his crime more closely when a Guideline is used that relates offense level to the amount of money taken.

We therefore affirm the district court's reliance on the larceny Guideline as the Guideline most analogous to appellant's contemptuous conduct.[17]

## 2. Loss Amount Determination

■ The district court's loss amount determination—$1.5 million—was not clearly erroneous. A district court's factual findings relating to loss must be established by a preponderance of the evidence, *United States v. Sasso*, 59 F.3d 341, 353 (2d Cir.1995), and we review them for "clear error." *United States v. Abbey*, 288 F.3d 515, 517 (2d Cir.2002) (*per curiam*). The commentary to U.S.S.G. § 2B1.1 defines loss under the larceny guideline as "the value of the property taken, damaged, or destroyed." U.S.S.G. § 2B1.1 (Appl. Note 2).

The issue here is not whether $1.5 million was transferred from the Palm Beach Princess but whether Brennan was responsible for more than $500,000 of that transfer. Although it is true that only $500,000 of the $1.5 million could be traced to appellant's attorney, Brennan had a—or the—

---

**17.** Appellant's contention that the larceny Guideline is inapplicable because the $75 million SEC judgment could not go to his New Jersey victims is, first, wrong, and, second, irrelevant.

First, it is quite possible that some of the money collected by the SEC will be given to individual victims. Appellant argued in the SEC Action that since he had settled a class action with private investors for $10 million, the SEC could no longer seek disgorgement from appellant. Judge Owen responded by stating that the SEC was "bringing this disgorgement action not to enrich any private citizen but ... to take the illegal profits from a wrongdoer and deter such further conduct." However, Judge Owen suggested that he could set-off the amount of the private settlement against any disgorgement order, and he eventually did so. *SEC v. First Jersey Secs.*,

*Inc.*, 890 F.Supp. at 1211 n. 35. Appellant and First Jersey then sought to collaterally attack the disgorgement claim in Pennsylvania, where the class action was settled, but the Pennsylvania court ordered only that the SEC was enjoined "from distributing these proceeds to any plaintiff or other Class Member in the ... class action without first applying to this Court." *In re First Jersey Secs. Inc.*, M.D.C. No. 681, 1994 WL 326829 at 4, 1994 U.S. Dist. LEXIS 9015, at *12 (E.D.Pa. June 28, 1994).

Second, his argument is irrelevant. Even if the $75 million judgment could not go to appellant's victims, his contempt offense would still be similar to larceny because he used assets that were frozen for the benefit of the SEC, his judgment creditor, for his own purposes.

major share of the boat—$12 million—and the diversion of $500,000 to his attorney was more than sufficient to show that he played at the least a substantial role in the transfer. It was not clear error, therefore, for the court to conclude that the entire amount was a loss attributable to Brennan's violation of the Freeze Order. The $1.5 million was transferred out of the boat as a unit; it followed a circuitous and covert path as a unit; it was divided only at the last step, after it reached Murray, appellant's close friend; and the only traceable funds from that division were used for Brennan's benefit. No more is needed to support the court's finding.

d) *Acceptance of Responsibility*

█ Appellant also argues—frivolously—that he was entitled as a matter of law to credit for acceptance of responsibility. U.S.S.G. § 3E1.1. A district court's determination of whether a defendant has accepted responsibility is a "factual finding that will not be disturbed unless it is without foundation." *United States v. Reyes*, 13 F.3d 638, 640 (2d Cir.1994) (internal quotation marks omitted). The district court's conclusion that appellant did not accept responsibility for his conduct was well founded, and we affirm it.

One consideration in favor of determining that a defendant has accepted responsibility is his "truthfully admitting the conduct comprising the offense(s) of conviction." U.S.S.G. § 3E1.1, appl. n. 1(a). However, appellant repeatedly sought to minimize or conceal the extent of his guilt by grossly misstating the facts. In his

November 19 letter and in his statements and submissions to the court during sentencing, appellant argued that the $500,000 "loan" from Murray was bona fide, did not result from a transfer of appellant's assets out of the boat, and was only in violation of the Freeze Order because appellant failed to send a copy of his promissory note to Murray to the SEC. Appellant submitted a document to the court that purported to be the note at issue but that the court determined was fabricated. This determination was not error; in fact, the note was not fully executed and bore a date that was a year after the transaction. To this date, Brennan refuses to accept responsibility for the full $1.5 million transferred out of the Palm Beach Princess. Accordingly, there is more than sufficient foundation to deny appellant credit for acceptance of responsibility.[18]

e) *Remand to a Different Judge*

█ We can direct that a case be assigned to a different judge for resentencing in "unusual circumstances," *United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977) (*per curiam*) (*in banc*) (describing the grounds on which reassignment would be appropriate). Where personal bias of the judge is not alleged, *Robin* directs us to consider the following factors:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be

---

**18.** Appellant is simply wrong when he argues that the district court applied an erroneous legal standard—namely, that only a defendant who pled guilty immediately after charges were filed was eligible for acceptance of responsibility points. Judge Owen did note that appellant pled guilty 15 months after the contempt charge was filed, but also noted that appellant fabricated the note, lied when he said the loan was bona fide, and was not completely honest in his admissions. The court stated that each of these latter factors was a sufficient independent ground for denial of acceptance of responsibility points. We agree.

rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id.* at 10. Reassignment will not usually be warranted merely because "a sentencing judge has been shown to have held erroneous views," *United States v. Bradley,* 812 F.2d 774, 782 n. 9 (2d Cir.1987). Moreover, a "misapprehension of the law is not the sort of previously-expressed view that one would have difficulty putting out of one's mind, once it was corrected." *United States v. Gonzalez,* 192 F.3d 350, 356 (2d Cir.1999) (*per curiam*) (internal quotation marks and alteration omitted).

 Remand to a different judge is not warranted here. Appellant has not alleged or shown that Judge Owen was biased against him but, rather, argues that the *Robin* factors militate in favor of reassignment. They do not. The only error made by the district court was a legal one in determining appellant's original CHC, which after all was suggested in the plea agreement; this type of previously expressed view is not difficult to put out of one's mind.

Appellant argues that the appearance of fairness requires reassignment because Judge Owen committed errors in the case and because some of Judge Owen's orders in the SEC Action were reversed, thus making him appear partial. Appellant also claims that since Judge Owen filed the criminal contempt charge and presided over it, his impartiality is in question. Both arguments are entirely meritless. Given the twenty year length of this proceeding, our occasional disagreement with some of Judge Owens' rulings is absolutely no basis for remand to a different judge. Moreover, the United States Code itself contemplates that a Judge will preside over a criminal contempt case in which he filed the charge. *See* 18 U.S.C. § 401 ("A court ... shall have power to punish ... contempt of its authority ...."). Finally, reassigning the case to a different judge would certainly "entail waste and duplication out of proportion to any gain in preserving the appearance of fairness," *Robin,* 553 F.2d at 10, because Judge Owen has held three sentencing hearings already and is fully versed in the complicated facts of this case.

## CONCLUSION

For the foregoing reasons, we remand for resentencing in light of the fact that appellant's original CHC was I rather than II. Otherwise we affirm.